Douglas H. BARBER; Heggem–Lundquist Paint Company, a Colorado corporation; and Rick Kerber, d/b/a Kerber's Oil Company, Petitioners/Cross–Respondents,

v.

Bill RITTER, Jr., as Governor of the State of Colorado; and Cary Kennedy, as Treasurer of the State of Colorado, Respondents/Cross–Petitioners.

No. 07SC373.

Supreme Court of Colorado,
En Banc.

Nov. 3, 2008.

Head & Associates, P.C., John F. Head, Denver, Colorado, Attorneys for Petitioners/Cross–Respondents.

John W. Suthers, Attorney General, Monica M. Márquez, Assistant Solicitor General, Maurice G. Knaizer, Deputy Attorney General, Public Officials Unit, State Services Section, Denver, Colorado, Attorneys for Respondents/Cross–Petitioners.

Brad D. Bailey, Assistant City Attorney, City of Littleton, Littleton, Colorado, Attorney for Amicus Curiae City of Littleton.

Justice BENDER delivered the Opinion of the Court.

### Introduction

In this case involving article X, section 20 of the Colorado Constitution ("Amendment 1"),[1] we review the court of appeals' opinion in *Barber v. Ritter*, 170 P.3d 763 (Colo.App. 2007).[2] In that opinion, the court of appeals held that Petitioners/Cross–Respondents Douglas Barber, Heggem–Lunquist Paint Company, and Rick Kerber ("Petitioners"), as Colorado taxpayers, established standing to challenge the transfer of over $442 million from thirty-one special funds to the state's General Fund, but that the legislative acts authorizing the fund transfers did not violate article X, section 20 of the Colorado Constitution. The court of appeals further held that the transfer of monies from all but three of the funds did not violate article XI, sections 3 and 4 of the Colorado Constitution.[3] As to the transfers from the remaining three funds, the Colorado Children's Trust Fund, the Severance Tax Trust Fund, and the Unclaimed Property Trust Fund, the court of appeals held that the trial court should not have granted summary judgment in favor of Respondents/Cross–Petitioners and remanded the case for further proceedings.

We affirm the decision of the court of appeals that Petitioners have taxpayer standing to challenge the transfers and that the transfers did not violate article X, section 20 of the Colorado Constitution. We hold that a charge is a "fee," and not a "tax," when the express language of the charge's enabling legislation explicitly contemplates that its primary purpose is to defray the cost of services provided to those charged. Because the purpose for which the charge is imposed, rather than the manner in which the monies generated by the charge are ultimately spent, determines the characterization of the charge as a fee or a tax, the transfer of fees from a cash fund to a general fund does not

---

1. In 1992, Colorado voters amended the state constitution, adding article X, section 20, which is commonly known as Amendment 1. One of Amendment 1's provisions requires advance voter approval for any "new tax, tax rate increase, ... or a tax policy change directly causing a net tax revenue gain to any district." Colo. Const. art. X, § 20(4)(a).

2. We granted certiorari review of the following four issues:

 1. Whether transferring money from multiple cash funds to the general fund to defray the general expenses of government requires voter approval because it constitutes a "tax policy change directly causing a net tax revenue gain" as that term is used in article X, section 20(4)(a) of the Colorado Constitution.
 2. Whether the use of special taxes, fees, surcharges, and assessments to replenish money transferred from multiple cash funds to the general fund requires voter approval because it constitutes a "new tax" or a "tax rate increase" within the meaning of article X, section 20(4)(a) of the Colorado Constitution.
 3. Whether taxpayers have standing to challenge transfers of money from cash funds to the general fund where the taxpayers paid no money into the cash funds and alleged no other connection to the funds.
 4. Whether the court of appeals erred in reversing the trial court's grant of summary judgment with respect to three cash funds, alleged to be public trusts, because of a lack of evidence regarding the operation of the funds.

3. Article XI, sections 3 and 4 of the Colorado Constitution govern the way in which government may create debt. Colo. Const. art. XI, §§ 3–4.

alter the essential character of those fees as fees.

A transfer of fees from a special cash fund to a general fund does not result in a net revenue gain within the meaning of Amendment 1 because fees are included in the definition of Amendment 1 revenue from the time they are collected. As such, a transfer of fees does not result in the production of additional revenue.

Under its plenary constitutional power to appropriate, the General Assembly has the authority to revoke or amend a public trust without seeking taxpayer approval. We therefore hold that the court of appeals erred in determining that summary judgment was inappropriate as to Petitioners' article XI claims and reverse.

We remand this case to the court of appeals to be returned to the trial court with directions to enter judgment in favor of Bill Ritter, Jr., as Governor of Colorado, and Cary Kennedy, as Treasurer of Colorado.

### Facts and Proceedings Below

During an economic downturn in Colorado between 2001 and 2004, the General Assembly enacted a series of bills to address revenue shortfalls in the state's general tax fund ("General Fund"). These acts directed the state treasurer to transfer over $442 million from thirty-one special cash funds to the state's General Fund as an extraordinary remedial measure.[4] These cash funds are financed by fees, surcharges, and special assessments. The fees charged in connection with these cash funds are used to subsidize the cost of governmental services provided to those charged, or to otherwise defray the social costs of their activities. The monies residing in each of the cash funds at issue in this case are included in the state's "fiscal year spending," as that term is defined in section 2(e) of Amendment 1. Section 2(e) exempts from "fiscal year spending" monies from several sources including, for example, pension earnings and federal funds. Fees, surcharges, and special assessments, which make up the cash funds at issue in this case, are subject to Amendment 1 spending limits. Colo. Const. art. X § 20(2)(e).[5]

As explained below, Petitioners have asserted a specific connection to five of these

4. The thirty-one cash funds from which transfers were made to the General Fund are as follows: Auto Dealers' License Fund, section 12–6–123, C.R.S. (2008); Collection Agency Cash Fund, section 12–14–136, C.R.S. (2008); Colorado Children's Trust Fund, section 19–3.5–106, C.R.S. (2008); Colorado Travel and Tourism Promotion Fund, section 24–49.7–106, C.R.S. (2008); Department of State Cash Fund, section 24–21–104, C.R.S. (2008); Disabled Telephone Users Fund, section 40–17–104, C.R.S. (2008); Educator Licensure Cash Fund, section 22–60.5–112, C.R.S. (2008); Emergency Response Cash Fund, section 34–32–122, C.R.S. (2008); Employment Support Fund, section 8–77–109, C.R.S. (2008); Family Stabilization Services Fund, section 19–1–125, C.R.S. (2008); Family Support Registry Fund, section 26–13–115.5, C.R.S. (2008); Hazardous Substance Response Fund, section 25–16–104.6, C.R.S. (2008); Major Medical Insurance Fund, section 8–46–202, C.R.S. (2008); Motor Carrier Fund, section 40–2–110.5, C.R.S. (2008); Off-Highway Vehicle Recreation Fund, section 33–14.5–106, C.R.S. (2008); Older Coloradans Cash Fund, section 26–11–205.5, C.R.S. (2008); Petroleum Storage Tank Fund, section 8–20.5–103, C.R.S. (2008); Real Estate Recovery Cash Fund, section 12–61–301, C.R.S. (2008); Severance Tax Trust Fund, section 39–29–109, C.R.S. (2008); Subsequent Injury Fund, section 8–46–101, C.R.S. (2008); Supplier Database Cash Fund, section 24–102–202.5, C.R.S. (2008); Trade Name Registration Fund, section 24–35–301, C.R.S. (2008); Unclaimed Property Trust Fund, section 38–13–116.5, C.R.S. (2008); Unemployment Compensation Fund, section 8–77–101 C.R.S. (2008); Uniform Consumer Credit Code Cash Fund, section 5–6–204, C.R.S. (2008); Victims & Witnesses Assistance & Law Enforcement Fund, section 24–4.2–103, C.R.S. (2008); Vital Statistics Records Cash Fund, section 25–2–121, C.R.S. (2008); Waste Tire Cleanup Fund, section 24–32–114, C.R.S. (2008); Workers' Compensation Cash Fund, section 8–44–112, C.R.S. (2008). Petitioners do not appeal the court of appeals' holding that the claims as to the Petroleum Storage Tank Fund and Real Estate Recovery Cash Fund are moot. Thus, the transfers from only 29 of the funds are before this court.

5. Section 20(2)(e) provides that " '[f]iscal year spending' means all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards or property sales." This definition does not exclude fees, surcharges, or special assessments from funds that count towards Amendment 1 revenue and spending limits.

thirty-one funds based on payments made to these funds. As to the remaining funds, Petitioners acknowledge that they have not paid money into the funds and that their only connection to the funds is as citizens and taxpayers.

Petitioner Douglas Barber is a real estate broker licensed by the Colorado Division of Real Estate. He has been a licensed real estate broker since 1975. The Real Estate Recovery Fund was a special fund created to reimburse members of the public for certain losses caused by brokers. The fund was financed through licensee disciplinary fines, reinstatement fees, and interest income. In addition, if the fund balance fell below $350,000, then the Real Estate Commission was required to set and collect a "recovery fund fee" from licensees when they renewed their licenses. Real estate brokers renew their licenses once every three years. Thus, when the Commission sets and collects a "recovery fund fee," it does so over a three-year cycle during which each licensee pays the fee one time.

In 2003, the General Assembly directed the state treasurer to transfer $3.2 million from the Real Estate Recovery Fund to the General Fund. Following that transfer, the balance dropped below $350,000, which prompted the Commission to assess a $31 recovery fund fee for the next three-year renewal cycle from 2005 to 2007.

In 2005, while this case was pending in the court of appeals, the General Assembly repealed the Real Estate Recovery Fund and the Commission stopped collecting the fee. As a result, Barber never paid the $31 recovery fund fee and never will.

Petitioner Heggem–Lundquist Paint Company does interior finishes for the construction industry and individual homeowners. Under Colorado law, Heggem–Lundquist must obtain workers' compensation insurance for its employees. Heggem–Lundquist pays approximately $400,000 per year in workers' compensation insurance premiums.

Pursuant to statute, all insurance companies pay a percentage surcharge on the workers' compensation premiums written in Colorado. The funds collected through the surcharge are allocated among four funds, including three funds at issue in this case: the Workers' Compensation Cash Fund, the Subsequent Injury Fund, and the Major Medical Insurance Fund. The surcharge rate has remained at 3.818% since 2003. The surcharge is assessed until the funds are "actuarially sound," meaning that the funds have sufficient reserves to cover future liabilities and expenses for all claims in the funds.

In 2002 and 2003, the General Assembly passed several bills directing the treasurer to transfer nearly $400 million from the various workers' compensation funds to the General Fund. Of that amount, $221.5 million was later restored. Heggem–Lundquist asserted that, but for the transfers, the funds would have become actuarially sound and the surcharge would have ended on July 1, 2004. Thus, as a result of the transfers, the period of time during with the surcharge was assessed was extended.

The surcharge is paid by insurance companies and not by employers themselves. While insurance companies may choose to pass that cost on to employers who purchase coverage, they are not obligated to do so.

Petitioner Rick Kerber does business as Kerber's Oil Company. He purchases fuel from Sinclair Oil Company, which he delivers in bulk to consumers. Kerber pays an environmental response surcharge on every tank of fuel he purchases. This surcharge goes into the Petroleum Storage Tank Fund, which provides funding for remediation of contamination caused by leaking petroleum storage tanks. The surcharge amount depends on the balance in the fund.

In 2002, the General Assembly directed the treasurer to transfer $4 million from the Petroleum Storage Tank Fund to the General Fund. Approximately nine months after the transfer, the fund balance fell below $5 million, which prompted a surcharge increase from $50 per tankload of fuel to $75.

While this case was pending in the court of appeals, the General Assembly authorized repayment of some of the transfers if certain fiscal conditions were met. These conditions were met in November 2005, and in January 2006, the treasurer restored the $4 million

that had been transferred from the Petroleum Storage Tank Fund.

Petitioners filed this action against Respondents in August 2004, asserting three claims: (1) the transfers from the special funds to the General Fund represented a "tax policy change directly causing a net tax revenue gain," a "new tax," or a "tax rate increase," without voter approval in violation of Amendment 1 because the transferred monies, which they allege became general tax dollars as a result of the transfer, would be expended to defray "general governmental expenses unrelated to the respective purposes for which the cash funds were created"; (2) some of the funds involved were "public trusts," and therefore the state as trustee had an obligation to repay the money it had transferred; and (3) the transfers created unconstitutional debt in violation of sections 3 and 4 of article XI of the Colorado Constitution. Petitioners sought declaratory judgment invalidating these acts and an order requiring the legislature to return the money to the funds. Petitioners brought these claims as taxpayers. Additionally, each Petitioner also asserted individual claims that the transfers of money from the special funds to which they had specifically contributed caused them economic injury in the form of additional fees and surcharges.

The parties filed cross-motions for summary judgment. The trial court dismissed Petitioners' general claims, concluding that they did not have standing as taxpayers to challenge the transfers from funds to which they had no individual connection, but that Barber had individual standing to contest the transfer from the Real Estate Recovery Fund,[6] and that Kerber had individual standing to contest the transfer from the Petroleum Storage Tank Fund.[7] However, the trial court dismissed Heggem–Lundquist's challenge regarding the workers' compensation funds. Addressing the merits of Petitioners' claims, the trial court concluded that the transfers did not violate the Colorado Constitution. Accordingly, the trial court granted summary judgment in favor of Respondents on all claims.

The court of appeals affirmed the trial court in part and reversed in part. *Barber*, 170 P.3d at 779. Initially, the court of appeals held that any claims involving the Real Estate Recovery Fund or the Petroleum Storage Tank Fund are moot. *Id.* at 767. While this case was pending, the Real Estate Recovery Fund was abolished and the money transferred from the Petroleum Storage Tank Fund was repaid. Thus, the court of appeals concluded that there were no longer existing controversies regarding these funds. *Id.* Petitioners do not challenge these holdings in this appeal. The panel also affirmed the trial court's ruling that Heggem–Lundquist lacked individual standing to challenge the transfers from the workers' compensation funds. *Id.* at 770. The court agreed that, because the insurance company, rather than Heggem–Lundquist itself, paid the surcharge allocated to those funds, Heggem–Lundquist failed to show any injury. *Id.*

However, the panel majority went on to reverse the trial court's ruling on "taxpayer standing," holding that Petitioners have standing as taxpayers to assert their challenges to the transfers from all of the special funds, except for the two mooted claims. *Id.* at 769. The majority held that Petitioners' interest in having general tax dollars spent in compliance with the state constitution was sufficient to confer standing. *Id.* The majority noted that, if Petitioners lacked standing to challenge the transfers, "we do not know who else could bring these constitutional challenges." *Id.*

Judge Hawthorne dissented from the majority's holding on taxpayer standing. *Id.* at 779. He argued that the majority's approach conflated the standing requirements of injury in fact and legally protected interests. *Id.* at 780. At most, he asserted, Petitioners satisfied only the legally protected interest prong. *Id.* He reasoned that Petitioners' allegations were the type of "undifferentiated, generalized grievances" that do not establish an

---

6. At the time of the summary judgment motion, the Real Estate Recovery Fund had not yet been abolished.

7. At the time of the summary judgment motion, the funds transferred from the Petroleum Storage Tank Fund had not yet been restored.

injury-in-fact. *Id.* at 779 (quoting *Lance v. Coffman,* 549 U.S. 437, ——, 127 S.Ct. 1194, 1198, 167 L.Ed.2d 29 (2007)). Although the Petitioners alleged in their complaint that the transferred monies, which became general tax dollars, would be used to defray general governmental expense, rather than defraying the cost of services provided to those who paid into the funds, Judge Hawthorne "disagree[d] with the majority's conclusion because here the Taxpayers do not challenge an expenditure of general tax dollars, but only a transfer from special funds to the general fund." *Barber,* 170 P.3d at 780. In response to the majority, Judge Hawthorne noted that the proper plaintiffs to challenge the transfers were persons who actually paid money into the special funds. *Id.* at 781.

On the merits, the majority affirmed the trial court's ruling that the transfers did not constitute a "new tax," "tax rate increase," or a "tax policy change directly causing a net tax revenue gain" under Amendment 1, because these transfers did not alter the essential character of the monies as fees rather than taxes. *Id.* at 773. In addition, the transfers did not increase the growth of government or create new income streams. *Id.* at 774.

The majority also rejected the claim that the transfers created unconstitutional "debt" in violation of sections 3 and 4 of article XI, because with the possible exception of three funds, the special funds were not trusts, and the transfers did not create a fiduciary duty to repay. *Id.* at 776. However, for three funds, the Colorado Children's Trust Fund, the Severance Tax Trust Fund, and the Unclaimed Property Trust Fund, the majority concluded that it was not able to determine from the record the manner in which disbursements may be made from each fund.

*Id.* Thus, it concluded that summary judgment should not have been granted as to these three funds, and remanded the case for further proceedings regarding these funds. *Id.* The parties then petitioned this court for certiorari review.

### Petitioners Have Taxpayer Standing

■ Standing is a threshold issue that must be satisfied in order for a court to decide a case on the merits. *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo.2004). Whether a plaintiff has standing to sue is a question of law that we review de novo. *Id.* at 856. In this appeal, Petitioners argue that they have standing on the grounds that they are citizens of Colorado who pay taxes into the state's General Fund. As such, they have standing to challenge the allegedly unconstitutional transfer of monies from the special cash funds to the General Fund and the expenditure of those monies for general governmental expense "unrelated to the respective purposes for which the cash funds were created." Thus, the standing issue before us concerns whether Petitioners have "taxpayer standing." [8]

■ To establish standing under Colorado law, a plaintiff must satisfy a two-part test requiring (1) that the plaintiff "suffered injury in fact," and (2) that the injury was to a "legally protected interest as contemplated by statutory or constitutional provisions." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 538 (1977); *see also Dodge v. Dep't of Soc. Servs.,* 198 Colo. 379, 382–83, 600 P.2d 70, 71–72 (1979) (applying the two-part *Wimberly* test in the context of taxpayer standing).

■ To constitute an injury-in-fact, the alleged injury may be tangible, such as phys-

---

**8.** It is undisputed that Petitioners have not paid money into any special fund other than the Petroleum Storage Tank Fund, which was restored in January 2006. Petitioners do not challenge the court of appeals' determination that individual claims made by Barber and Kerber to transfers made from the Real Estate Recovery Fund and the Petroleum Storage Tank Fund, respectively, are moot because the Real Estate Recovery Fund has been abolished and the Petroleum Storage Tank Fund has been repaid. *See Barber,* 170 P.3d at 767.

Nor do Petitioners challenge the court of appeals' determination that Heggem–Lundquist lacks standing to raise its individual claims to transfers made from the Major Medical Insurance Fund, the Subsequent Injury Fund, and the Workers' Compensation Cash Fund because Heggem–Lundquist's workers' compensation insurer, not Heggem–Lundquist, paid into these funds. *Id.* at 770. For this reason, we do not address whether Petitioners have standing on their individual claims.

ical damage or economic harm, or intangible, such as aesthetic harm or the deprivation of civil liberties. *Ainscough*, 90 P.3d at 856 (collecting cases). However, an injury that is "overly 'indirect and incidental' to the defendant's action" will not convey standing. *Id.* (quoting *Wimberly*, 194 Colo. at 168, 570 P.2d at 538). Whether the plaintiff's alleged injury was to a legally protected interest "is a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Ainscough*, 90 P.3d at 856. Like an injury-in-fact, a legally protected interest may be tangible or intangible. *Id.* It may rest in property, arise out of contract, lie in tort, or be conferred by statute. *Wimberly*, 194 Colo. at 166, 570 P.2d at 537. Alternatively, a legally protected interest may involve free speech or expression, *Conrad v. City and County of Denver*, 656 P.2d 662, 668 (Colo.1982),[9] or a desire to ensure "that governmental units conform to the state constitution" under the terms of Amendment 1. *Nicholl v. E–470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo.1995).[10]

▮ Colorado case law provides "broad taxpayer standing in the trial and appellate courts." *Ainscough*, 90 P.3d at 856. For example, we have stated that in consideration of the first requirement of the *Wimberly* test, "taxpayers have standing to seek to enjoin an unlawful expenditure of public funds." *Nicholl*, 896 P.2d at 866. Using even broader language, we have stated that "even where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution." *Id.*; *see also Conrad*, 656 P.2d at 668 (reasoning

that the injury-in-fact requirement is satisfied when the plaintiff-taxpayer's alleged injury "flow[s] from governmental violations of constitutional provisions that specifically protect the legal interests involved").

"Thus, we have interpreted *Wimberly* to confer standing when a plaintiff argues that a governmental action that harms him is unconstitutional." *Ainscough*, 90 P.3d at 856; *see also Nicholl*, 896 P.2d at 866 (reasoning that the plaintiff-taxpayer satisfied the first part of the *Wimberly* test "because he seeks review of what he claims is an unlawful government expenditure which is contrary to our state constitution").

▮ In this appeal, Petitioners seek standing as Colorado citizens who pay taxes into the state's General Fund. To show that they have satisfied both parts of the *Wimberly* test, Petitioners argue that the transfers of money from the special funds to the General Fund violated their interest in the government acting in accordance with Amendment 1.

Amendment 1 provides that "[i]ndividual or class action enforcement suits may be filed and shall have the highest civil priority of resolution." Colo. Const. art. X, § 20(1). Because the issues presented by Petitioners in this case concern the enforcement of Amendment 1, the legally protected interest requirement of the *Wimberly* test is satisfied. *See Nicholl*, 896 P.2d at 866.

▮ Concerning the injury-in-fact requirement of the *Wimberly* test, we hold, as we did in *Nicholl*, that Petitioners suffered an injury-in-fact because they seek review of what they claim "is an unlawful government

---

**9.** In *Conrad*, several Denver taxpayers challenged the use of city tax dollars to fund the display of a nativity scene among other Christmas holiday decorations on the steps of Denver's city and county building. 656 P.2d at 665–66. Holding that the plaintiffs had taxpayer standing, this court reasoned that the plaintiff-taxpayers had both an "intangible interest in a government that does not prefer or support the Christian religion over all others, including their own" and an "economic interest in having their tax dollars spent in a constitutional manner." *Id.* at 668.

**10.** *Nicholl* concerned the constitutionality of a plan by the E–470 Public Highway Authority to refinance a highway construction project by re-

leasing bond proceeds out of escrow and remarketing the debt to generate additional revenue. 896 P.2d at 861–64. There, we held that John Nicholl, an Arapahoe County taxpayer and an Arapahoe County Commissioner, had standing, as a taxpayer, to challenge the constitutionality of the Authority's financing plan. *Id.* at 866. We reasoned that because "taxpayers have standing to seek to enjoin an unlawful expenditure of public funds," Nicholl was permitted to bring "an enforcement action as an individual taxpayer" to determine whether the Authority and its financing plan were subject to regulation under Amendment 1. *Id.*

expenditure which is contrary to our state government." *Id.* at 866. We acknowledge that this reasoning may appear to collapse the *Wimberly* two-part test into a single inquiry as to whether the plaintiff-taxpayer has averred a violation of a specific constitutional provision. *See Dodge,* 198 Colo. at 384, 600 P.2d at 73 (Dubofsky, J., concurring). However, Colorado case law requires us to hold that when a plaintiff-taxpayer alleges that a government action violates a specific constitutional provision such as Amendment 1, such an averment satisfies the two-step standing analysis. *See id.* at 382–83, 600 P.2d at 72 (holding that taxpayers had standing to challenge the disbursement of public funds to finance non-therapeutic abortions).[11]

Hence, we hold that Petitioners have taxpayer standing to challenge the constitutionality of the transfers of money from the special funds to the state's General Fund and the concomitant expenditure of that money to defray general governmental expense, rather than to defray the cost of services provided to those charged. Having determined this threshold issue, we now discuss whether the transfers required voter approval under the requirements of Amendment 1.

## The Transfers of Monies from the Cash Funds to the General Fund Do Not Require Voter Approval

### Introduction

Amendment 1 limits the amount of revenue state and local governments can retain from all (save, essentially, federal) sources at the end of a fiscal year. *Havens v. Bd. Of County Comm'rs,* 924 P.2d 517, 519–20 (Colo. 1996); Colo. Const. art. X, §§ 20(7)(d), 2(e). If the government's revenue exceeds this limit, the excess must be refunded to the taxpayers, unless their approval to retain the money is sought and obtained. Colo. Const.

art. X, § 20(7). Amendment 1 implements its fiscal objectives, in part, by requiring that voters approve any "new tax, tax rate increase … or tax policy change directly causing a net tax revenue gain to any district." *Id.* at § 20(4)(a). This voter approval requirement is one of the critical components of Amendment 1: it reserves to the taxpayers the power to override the strictures of the amendment and allow their governments to retain revenue in excess of the default fiscal year limits. At issue in this case are Amendment 1's voter approval requirement provisions in section 20(4)(a).

Petitioners advance two theories under which they argue that the transfer of monies from the twenty-nine cash funds at issue in this case to the General Fund violated Amendment 1:(1) the transfers themselves constituted a "tax policy change directly causing a net tax revenue gain" to the state [12]; and (2) the post-transfer collection of these fees constitute a "new tax" or a "tax rate increase" because these fees are replenishing the monies diverted to the General Fund, and, therefore, are indirectly defraying the general cost of government. As explained below, we disagree with both arguments.

■ As a preliminary matter, we note the heavy presumption of constitutionality enjoyed by the statutes directing the transfers. *Colo. Ass'n of Pub. Employees v. Bd. of Regents of the Univ. of Colo.,* 804 P.2d 138, 142 (Colo.1990). The presumption of a statute's constitutionality can be overcome only if it is shown that the enactment is unconstitutional beyond a reasonable doubt. *Id.* Petitioners argue that we are to favor a construction of Amendment 1 that would "reasonably restrain most the growth of government." *See* Colo. Const. art. X, § 20(1). However, we have held that this principle of Amendment 1 construction applies only where the

---

11. *See also People ex rel. Salazar v. Davidson,* 79 P.3d 1221, 1229 n. 4 (Colo.2003) (holding that the attorney general had standing in his official capacity to challenge a redistricting statute and noting in dicta that he would have had standing to do so as a taxpayer); *Nicholl,* 896 P.2d at 866 (holding that an Arapahoe County taxpayer had standing as a taxpayer to challenge the E–470 Public Highway Authority's plan to finance highway construction); *Conrad,* 656 P.2d at 668–69

(holding that citizen-taxpayers had standing to challenge the expenditure of city funds to finance the display of a nativity scene as part of the Christmas holiday decorations on the steps of Denver's city and county building).

12. For purposes of Amendment 1, the state itself is considered a "district." Colo. Const. art. X, § 20(2)(b).

text of the Amendment supports multiple interpretations equally. *Havens,* 924 P.2d at 521.

Moreover, we have consistently rejected readings of Amendment 1 that would hinder basic government functions or cripple the government's ability to provide services. *Id.* (declining to adopt a "rigid interpretation of [Amendment] 1, which would have the effect of working a reduction in government services") (quoting *Bolt v. Arapahoe County Sch. Dist. No. Six,* 898 P.2d 525, 537 (Colo. 1995)); *In re Submission of Interrogatories on House Bill 99–1325,* 979 P.2d 549, 557 (Colo.1999) (rejecting an interpretation of Amendment 1 that would "cripple the everyday workings of government"). In the context of the case now before us, we are especially mindful of the cautious line we have drawn to reasonably interpret Amendment 1 and maintain the government's ability to function efficiently. Arguably, requiring the state to return nearly half a billion dollars from the General Fund to the special cash funds would place a significant financial burden on the state. Under our rules of Amendment 1 construction, we should require such a result only if the text of the amendment leaves us no other choice.

## I. The Transfers from the Cash Funds to the General Fund Do Not Constitute a "Tax Policy Change Directly Causing a Net Tax Revenue Gain."

 We disagree with Petitioners' claim that the transfers constituted a "tax policy change directly causing a net tax revenue gain," thus triggering Amendment 1's voter approval requirement, for three reasons.

First, the transfers did not involve "taxes." The primary statutory purpose for the collection of the transferred monies was to defray the cost of special services provided to those who paid the charge. As such, the monies were "fees" when initially collected and remained "fees" even after they were transferred to the General Fund.

Second, the transfers did not result in a "net tax revenue gain." This is so because "fees," not "taxes," were involved in the transfers. Additionally, fees constitute "revenue" under Amendment 1 accounting princi-

ples from the time they are collected. Thus, the transfer of some of these fees to the General Fund cannot, by definition, result in the generation of additional revenue.

Third, Petitioners' argument entails factual consequences that are at odds with the purposes of Amendment 1: revenue limits would be artificially lowered as a result of "double counting" transferred funds, once at the time of collection and then again at the time of transfer.

## A. The Transfer of Fees from Cash Funds to the General Fund Did Not Transform those Fees into "Taxes"

Petitioners' argument that the transfer of monies from the special cash funds to the General Fund constitutes a "tax policy change directly causing a net tax revenue gain," is premised on the characterization of those monies as "taxes." We disagree with this characterization, and are, therefore, not persuaded by this argument.

 Each of the twenty-nine cash funds at issue in this case, with the exception of the Unclaimed Property Trust Fund, are financed by fees, surcharges, or similar assessments. A fee is distinct from a tax in that, "[u]nlike a tax, a special fee is not designed to raise revenues to defray the general expenses of government, but rather is a charge imposed upon persons or property for the purpose of defraying the cost of a particular governmental service." *Bloom v. City of Fort Collins,* 784 P.2d 304, 308 (Colo. 1989). To determine whether a government mandated financial imposition is a "fee" or a "tax," the dispositive criteria is the primary or dominant purpose of such imposition at the time the enactment calling for its collection is passed. *Zelinger v. City and County of Denver,* 724 P.2d 1356, 1358 (Colo.1986) ("A hallmark of [ad valorem] taxes is that they are *intended* to *raise* revenue to defray the general expenses of the taxing entity"; and holding that the ordinance in question did not "*raise* revenue for general municipal purposes *as a sole or principal object.*") (emphasis added); *Bloom,* 784 P.2d at 308 ("A special fee, however, might be subject to invalidation as a tax when the *principal pur-*

*pose* of the fee is to *raise* revenues for general municipal purposes rather than to defray the expenses of the particular service for which the fee is imposed.") (emphasis added).

To determine how the legislature "intended" to use the monies generated by a particular charge, we look to the language of the enabling statute for its expression of the primary purpose for the original imposition of that charge. *Rancho Colorado, Inc. v. City of Broomfield,* 196 Colo. 444, 449, 586 P.2d 659, 663 (1978). If the language discloses that the primary purpose for the charge is to finance a particular service utilized by those who must pay the charge, then the charge is a "fee." On the other hand, if the language states that a primary purpose for the charge is to raise revenues for general governmental spending, then it is a tax. Moreover, the fact that a fee incidentally or indirectly raises revenue does not alter its essential character as a fee, transforming it into a tax. *Western Heights Land Corp. v. City of Fort Collins,* 146 Colo. 464, 469, 362 P.2d 155, 158 (1961) ("If [an ordinance's] principal object is to defray the expense of operating a utility directed against those desiring to use the service, *the incidental production of revenue does not make it a revenue measure.*") (emphasis added); *Colorado Nat'l Life Assur. v. Clayton,* 54 Colo. 256, 259, 130 P. 330, 332 (1913); *see also, Marcus v. Kansas Dep't of Revenue,* 170 F.3d 1305, 1311 (10th Cir.1999) (rejecting characterization of charge as a "tax," reasoning that "[w]hile some part of the funds collected ... may ultimately reach the general fund of the county ... the governing statute expressly ties these monies to the administration of the motor vehicle registration laws."); *Hager v. City of West Peoria,* 84 F.3d 865, 870–71 (7th Cir.1996) ("Rather than a question solely of *where* the money goes, the issue is *why* the money is taken.") (emphasis in original).

Thus, when determining whether a charge is a fee or a tax, courts must look to the primary or principal purpose for which the money was *raised,* not the manner in which it was ultimately *spent.*[13]

It is undisputed here that, while the monies resided in the special cash funds, they were fees. Petitioners argue that when the monies were transferred to the General Fund, they became taxes because they were then used to defray the general expenses of government.

Petitioners cite *Bloom* to buttress this argument. 784 P.2d at 311. In *Bloom,* we held that an ordinance imposing a "transportation utility fee" on the owners or occupiers of developed lots or parcels of land within the city was not a tax, but rather a fee assessed for the purpose of defraying the cost of a particular service provided to those assessed, specifically, the maintenance of local streets. *Id.* However, we also held that the portion of the ordinance which authorized the city council to transfer any excess revenues generated by the special fee to any other fund of the city was "tantamount to requiring the class of persons responsible for the fee ... to bear a disproportionate share of the burden of providing revenues to defray *general government expenses* unrelated to the purpose for which the fee is imposed." *Id.* (emphasis in original). Thus, this "pour-over" provision violated article X, section 3 of the Colorado Constitution, which requires that all taxes be uniform on each of the various classes of real and personal property located within the taxing authority. *Id.*

---

13. We are not alone in concluding that the primary purpose for which the legislature originally imposes a charge is the dispositive criteria in determining whether that charge is a fee or a tax. As the court of appeals pointed out below, the Oregon, Oklahoma, and New Hampshire Supreme Courts have reached the same conclusion. *See Bobo v. Kulongoski,* 338 Or. 111, 107 P.3d 18, 23 (2005) ("[N]ot every bill that collects or brings in revenue to the treasury is a 'bill for raising revenue.' Rather, the definition of 'revenue' suggests that the framers had a specific bill in mind—bills to levy taxes and similar exactions."); *Calvey v. Daxon,* 997 P.2d 164, 171 (Okla.2000) ("Incidental fees and taxes, not constituting revenue raising measures do not become subject to the procedural requirements of [a constitutional provision prohibiting the raising of taxes without a vote of the people] *via the mere transfer from one fund to another.*" (emphasis added)); *Baines v. New Hampshire Senate President,* 152 N.H. 124, 876 A.2d 768, 780 (2005) ("[M]oney bills or bills for raising revenue are confined to bills which levy taxes in the strict sense of the word, and do not apply to bills which incidentally raise revenue or involve appropriation of state money.").

*Bloom* does not compel the conclusion that any transfer of fees from special cash funds to a general municipal or state fund results in the transformation of that fee into a tax. In *Bloom*, the city ordinance at issue explicitly contemplated the transfer of excess revenue to the general municipal fund. The ordinance did not incidentally produce revenue to defray the general cost of government; instead, revenue production was one of its principal and unequivocal aims. In the present case, the primary purpose of the enactments that created the special cash funds was solely to defray the cost of services provided to those assessed. Unlike *Bloom*, none of the statutes creating these cash funds contain a "pour-over" or like provision that provides for the production of revenue to defray general government expense. There is no indication in the language of the cash funds' enabling legislation that, at the time the enactments at issue were passed and the fees collected, the intent of the legislature was anything other than to use the fees to subsidize the costs of special services.

■■■ The fact that the fees were eventually transferred to the General Fund does not alter their essential character as fees because the transfer does not change the fact that the primary object for which they were collected was not to defray the general cost of government. At most, the transfer of fees to a general fund where, as here, the statutes authorizing assessment of those fees do not contemplate the generation of revenue for general use, "incidentally" makes funds available to defray the general cost of government. As our precedent states, such incidental defraying of general governmental expense does not transform a fee into a tax.[14] *See, e.g., Western Heights Land Corp.*, 146 Colo. at 467–68, 362 P.2d at 158 (plaintiff alleged that an ordinance did not strictly tie the charge to the cost of services; we looked to the language of the ordinance and held that its principal purpose was to defray the cost of special services and that "the incidental production of revenue," which was not contemplated in the language of the ordinance, "does not make [the ordinance] a revenue measure"); *Ard v. People*, 66 Colo. 480, 484, 182 P. 892, 893 (1919) ("A revenue measure is one which has for its object the levying of taxes in the strict sense of the words. If the principal object is another purpose, the incidental production of revenue growing out of the enforcement of the act will not make it one for raising revenue.").

■■■ In sum, we hold that a charge is a "fee," and not a "tax," when the express language of the charge's enabling legislation explicitly contemplates that its primary purpose is to defray the cost of services provided to those charged. Because the purpose for which the charge is imposed, rather than the manner in which the monies generated by the charge are ultimately spent, determines the characterization of the charge as a fee or a tax, the transfer of fees from the cash funds to the General Fund in this case did not alter the essential character of those fees as fees.[15]

### B. The Transfers Did Not Result in a Net Revenue Gain

■■ Not only did the transfers in this case not involve "taxes," and therefore fail to trigger Amendment 1's voter approval provision, they did not result in a "net tax revenue gain." Initially, we note that the reasoning applied above, that the transfer of the fees to the General Fund did not alter their essential character as fees, is equally applicable to the phrase "net *tax* revenue gain." Because the fees were not taxes, they could not result in a

14. We note that the same reasoning applies to the transfer of funds from the Unclaimed Property Trust Fund: that the funds were transferred does not alter their character as unclaimed property—the funds do not become taxes.

15. Although Petitioners do not raise this issue, we note that a statutory charge may be labeled a fee, but in effect be a tax, if the statutory rate of the charge is unreasonably in excess of the cost of services the charge is designed to defray. The rate of fees imposed on users must bear some reasonable relationship to the cost of services provided. *See Western Heights Land Corp.*, 146 Colo. at 468, 362 P.2d at 158; *see also Marcus*, 170 F.3d at 1311–12. However, as our precedent indicates, assuming that the rate of fees imposed bears some reasonable relationship to the cost of services provided, the fact that some funds will reach the General Fund, only incidentally defrays general governmental expense.

net *tax* revenue gain. As a practical matter, however, Amendment 1 accounting principles do not treat the transfer of monies from cash funds to the General Fund as directly causing a net revenue gain, even apart from the characterization of those monies as "fees" rather than "taxes."

Like actual tax dollars that flow into the General Fund, fees, surcharges, and special assessments residing in special cash funds count toward Amendment 1 spending and revenue limits. Colo. Const. art. X, § 2(e).[16] Because fees, surcharges, and special assessments count toward Amendment 1 revenue and spending limits, they must, by definition, be included in "Amendment 1 revenue." The State's annual audit report of the Schedule of TABOR Revenue bears out this conclusion. This report, conducted pursuant to section 24–77–106.5, C.R.S. (2008), states that Amendment 1 revenue includes monies generated by fees and residing in special cash funds. Office of the State Auditor, Schedule of TABOR Revenue, September 2007, at 10. The September 2007 report makes clear that "[t]here are two types of revenue subject to the growth limitations set forth in Amendment 1—general funds and cash funds." *Id.*[17] If the fees residing in the cash funds are revenue from the time they are collected, they cannot, as Petitioners argue, later become revenue once they are moved. That is, the fees did not become revenue by virtue of their transfer; they were already counted as revenue when they resided in the special cash funds. Therefore, their transfer did not result in the production of additional revenue, and thus did not "directly caus[e] a net tax revenue gain." Metaphorically, all monies that count toward Amendment 1 spending and revenue limits are treated as a single coffer. The transfers here simply shifted previously collected money within the state's Amendment 1 coffer. Amendment 1 does

not prohibit this redistribution of money because it does not increase overall Amendment 1 revenue.

Finally, were we to adopt the position that the transfer of monies from special cash funds to the General Fund results in a net tax revenue gain, it would lead to results contrary to the purpose of Amendment 1. Transfer of monies from one fund to the other does not increase the overall amount of Amendment 1 revenue available to the state. Treating the transfers at issue here as a "net tax revenue gain" would "double count" the transferred revenue against Amendment 1 revenue limits, even though, as a practical matter, the transfers here did not increase the size of the government or create new income streams. In effect, Petitioners ask us to read Amendment 1 as counting fees generated by cash funds as revenue once when they are collected and again when they are transferred. So, even though the government has the same amount of money to spend as it did before the transfer, Amendment 1 views the government as somehow having more money as the result of the transfer. The idea that Amendment 1 would operate so as to restrain the operation of government when no growth at all attends such operations does not appear to be consonant with the primary purpose of the amendment and our principles of Amendment 1 construction. As we have said, Amendment 1 does not operate so as to needlessly "cripple" government, but rather to restrain reasonably its growth. Petitioners' view entails the restraint of government functions absent any growth whatsoever.

## II. The Post–Transfer Collection of Fees by the Cash Funds Does Not Constitute a "New Tax" or a "Tax Rate Increase."

Petitioners argue that the post-transfer collection of fees, surcharges, and

---

16. Section 20(2)(e) provides that " '[f]iscal year spending' means all district expenditures and reserve increases except, as to both, those for refunds made in the current or next fiscal year or those from gifts, federal funds, collections for another government, pension contributions by employees and pension fund earnings, reserve transfers or expenditures, damage awards or property sales." This definition does not exclude fees, surcharges, or special assessments from

funds that count towards Amendment 1 revenue and spending limits.

17. That report, for example, included as Amendment 1 revenue income from: business licenses and permits, non-business licenses and permits, health service fees, public safety service fees, driver's licenses, etc. Office of the State Auditor, Schedule of TABOR Revenue, September 2007, at 11.

special assessments that will be paid into the twenty-nine cash funds at issue constitutes a "new tax" or a "tax rate increase," thereby triggering the voter approval requirement in Amendment 1.

Based on the distinction between a "fee" and a "tax" we have drawn above, the alleged replenishment of the cash funds transferred to the general fund is not being accomplished by the imposition of a "tax," but through the continued collection of fees, surcharges, and special assessments. These fees are being collected, not with the primary purpose of defraying the general cost of government, as was the aim of the "pour-over" provision in *Bloom*, but strictly to defray the cost of particular services used by those charged. Because the charges are fees and not taxes, they cannot constitute a "new tax" or "tax rate increase," triggering the voter approval requirements of Amendment 1.

Petitioners argue that, because the fees now being collected are replacing those that were transferred to the General Fund, these fees are indirectly defraying the general cost of government. Therefore, the fees constitute an indirect tax. The premise here is as follows: if the monies in the cash funds had not been transferred, then the fees at issue would not be currently imposed or collected for these cash funds' services. The evidentiary record does not support this argument.

The uncontroverted evidence provided by the governor and treasurer supports the conclusion that many funds saw no fluctuation in rate as a result of the transfer, and that the rate of some fees even decreased. For the

fees that increased or remained the same, Petitioners failed to produce any evidence that the increase or continued imposition of the fees resulted from the transfer of monies in the cash funds to the General Fund.[18] Of course, the fact that some of the funds experienced a decrease in rate tends to negate the inference that the current imposition of the fees has any direct causal connection to the transfers in the sense that they are currently being collected in order to replenish those cash funds. Without evidence establishing this causal connection, it cannot be said beyond a reasonable doubt that the post-transfer collection of fees, authorized by the General Assembly, is indirectly defraying the general cost of government. On the record before us, we cannot accept the conclusion argued by Petitioners.

Even if we accept the factual premise asserted by Petitioners, we would still find this argument unpersuasive. As we have said, "the incidental production of revenue growing out of the enforcement of [an] act will not make it a bill for raising revenue." *Clayton*, 54 Colo. at 259, 130 P. at 332. Because the primary purpose of the statutes at issue, as indicated by their plain language, is not to raise revenue for general governmental expense, any production of such revenue can only be "incidental," and does not, therefore, constitute a tax.

### The Transfers Did Not Create Unconstitutional Debt in Violation of Article XI of the Colorado Constitution

Petitioners argue that three of the cash funds at issue in this case, the Colorado

---

**18.** With the exception of two funds: the Real Estate Recovery Fund and the Petroleum Tank Storage Fund. The claims for these funds, however, are moot. As to the Workers' Compensation Cash Fund, § 8-44-112(1)(a), C.R.S. (2008); the Subsequent Injury Fund, § 8-46-102(2)(a)(I), C.R.S. (2008); and the Major Medical Insurance Fund, § 8-46-202 C.R.S. (2008), Petitioners argue that the surcharge would have ended on July 1, 2004, but for the transfers. This inference is based on a FY 2003-04 Budget Briefing prepared by the Joint Budget Committee. By agency rule, the Director of the Division of Workers' Compensation terminates the surcharge when the funds become actuarially sound. The Director's determination of actuarial soundness is made on the basis of an independent actuarial study and only his or her judgment is dispositive. §§ 8-46-102(2)(a)(I); (3)(a), (b), C.R.S. (2008). The Di-

rector's determination of actuarial soundness is made after it has already been achieved. In contrast, the study cited attempts to project when soundness might be achieved. This particular study is especially irrelevant because it relies on a 2001 actuarial report made before the events of September 11, 2001. Of course, those events affected the actuarial assumptions made in that report since the market rate of return fell. (Aff. of the Director of the Division of Workers' Compensation at 4). To date the Director has not declared these funds actuarially sound. *Id.* As to the other cash funds, Petitioners have cited no evidence that the fee increases or continued imposition of the fees, if any, had any direct causal connection to the transfers. We decline to draw the inference of such a connection on Petitioners' behalf.

Children's Trust Fund, the Severance Tax Trust Fund, and the Unclaimed Property Trust Fund, are public trusts and that the transfer of monies from the cash funds constituted a misappropriation of the trust corpus, triggering an obligation to repay the transferred monies. §§ 19–3.5–106, C.R.S. (2008) (Colorado Children's Trust Fund); 39–29–109, C.R.S. (2008) (Severance Tax Trust Fund); 38–13–116.5, C.R.S. (2008) (Unclaimed Property Trust Fund). This obligation to repay, Petitioners argue, violates article XI of the Colorado Constitution in two ways: (1) the transfer violates section 3 of article XI because it constitutes public indebtedness not created within any of the exceptions of that section, and (2) the transfer violates section 4 of article XI because no action was taken by the legislature to provide for a tax that would generate sufficient revenues to "pay the interest on and extinguish the principal of such debt." [19]

The court of appeals rejected Petitioners' argument that the cash funds at issue were public trusts as to all but the three funds before this court. The court of appeals singled out these three cash funds because the word 'trust' appeared in the funds' enabling legislation, and remanded to the trial court for further development of the record as to "the manner in which disbursements may be made from those funds." *Barber*, 170 P.3d at 776. We hold that the court of appeals erred in reversing the trial court's grant of summary judgment in favor of Respondents/Cross–Petitioners with respect to those three cash funds.

■ We accept for the sake of argument, but do not decide, that these three cash funds are public trusts. Petitioners' argument turns on the implicit premise that the General Assembly lacked the power to alter or amend the statutes creating the trusts. The amendments providing for the transfer were, therefore, ineffective, and the transfers

then constituted a misappropriation of the trust corpus, triggering a fiduciary duty to repay the funds.

■ Petitioners argue that the General Assembly's lack of power to amend the statutes in question arises from the special status of the funds created by those statutes as trusts. Colorado follows the view of most jurisdictions that a trust, once created, may not be revoked by the settlor without the consent of all beneficiaries, unless the settlor has explicitly reserved to himself or herself the power to do so unilaterally. *Denver Nat'l Bank v. Von Brecht*, 137 Colo. 88, 322 P.2d 667 (1958); *see also* Restatement (Second) of Trusts § 330 (1959) (stating the majority view and collecting cases).

■ None of the statutes creating the funds explicitly reserve to the General Assembly the power as settlor to revoke or amend them.[20] However, we have repeatedly recognized that the General Assembly's power over appropriations is constitutionally derived and have characterized this power as "absolute" and "plenary." *Colorado Gen. Assembly v. Lamm*, 700 P.2d 508, 519 (Colo. 1985) ("It is undisputed that the power to legislate granted to the General Assembly by article V, section 1 of the Colorado Constitution permits the General Assembly to define the operation of grants of governmental authority articulated by the constitution, and that the power of the General Assembly over appropriations is absolute.") (internal citations omitted); *Mac Manus v. Love*, 179 Colo. 218, 221–22, 499 P.2d 609, 610 (1972); *In re Continuing Appropriations*, 18 Colo. 192, 193, 32 P. 272 (1893) ("The power of the legislature, except as otherwise restricted by the constitution, is plenary over the entire subject [of appropriations].") *Dempsey v. Romer*, 825 P.2d 44, 51 (Colo.1992) ("The General Assembly enjoys broad legislative responsibility under our constitution to raise and spend funds for governmental purposes,

---

**19.** Petitioners do not seek certiorari review of the court of appeals' ruling that none of the remaining cash funds are trusts. Also, Petitioners do not seek review of the court of appeals' determination that the statutes did not pledge future revenues to repayment of the transferred funds, and so did not create unconstitutional debt in violation of section 3.

**20.** *See* §§ 39–29–109, C.R.S. (2008) (Severance Tax Trust Fund); 19–3.5–106, C.R.S. (2008) (Colorado Children's Trust Fund); 38–13–116.5, C.R.S. (2008) (Unclaimed Property Trust Fund).

but authority must be exercised in conformity with express or implied restraints imposed thereon by specific constitutional provisions."). To hold that the General Assembly could limit this plenary power to appropriate by creating an irrevocable public trust would be to effectively hold that the General Assembly could abrogate its constitutional powers by statute. This is not the law. Our constitution requires that amendments thereto be approved by a two-thirds majority of each legislative house and an affirmative majority of the electorate. Colo. Const. art. XIX, § 2. "If a statute is susceptible of both constitutional and unconstitutional interpretations, courts will construe it to avoid constitutional infirmities." *Colorado State Bd. of Med. Exam'rs v. Jorgensen*, 198 Colo. 275, 278, 599 P.2d 869, 871 (1979). We therefore decline to read the cash funds' enabling legislation as creating *irrevocable* trusts that would unconstitutionally restrain the legislature's plenary power over appropriations.

The status of the three cash funds as public trusts does not, and constitutionally cannot, have any limiting effect on the legislature's plenary power to amend or repeal those funds' enabling statutes. The legislature's amendment of the cash funds' enabling statutes to allow for the transfer of funds to the General Fund did not, therefore, constitute a misappropriation of the trust corpus, and did not trigger a fiduciary obligation to repay the transferred monies. Thus, we hold that, even if the cash funds are public trusts, they are not irrevocable trusts, and the legislature has the authority to amend them to allow for the transfer of monies to the General Fund.

## Conclusion

For the reasons stated in this opinion, the judgment of the court of appeals is affirmed in part and reversed in part. The case is remanded to the court of appeals to be returned to the trial court with directions to enter judgment in favor of Bill Ritter, Jr., as Governor of Colorado, and Cary Kennedy, as Treasurer of Colorado.

Justice EID concurs in the judgment,
Justice RICE and Justice COATS join in the concurrence.

Justice EID, concurring in the judgment.

Petitioners claim in this case that monies in special cash funds were transferred into the general fund in violation of Amendment 1. Yet it is undisputed that not a single petitioner actually paid into the special cash funds that they allege were improperly depleted. Because the only injury alleged in the suit is the improper depletion of the special cash funds, petitioners cannot satisfy the injury-in-fact requirement of the standing inquiry. The majority's ruling—which permits petitioners to pursue their claim under Amendment 1, albeit rejecting it on the merits—stretches the concept of standing so far that, after today, virtually *any* taxpayer can bring *any* claim alleging that a government entity has acted in an unconstitutional manner. Such generalized grievances about government operations do not constitute a controversy to be decided by the judiciary, but rather should be directed to the General Assembly or the executive branch. I therefore concur only in the result reached by the majority.

### I.

The standing doctrine has its roots in the concept of separation of powers. Article III of the Colorado Constitution provides that no branch of government "shall exercise any power properly belonging to" another branch, except where the Constitution expressly permits. We have described the exercise of the judicial power as "delicate in character, ... for it may result in disapproval of acts of the legislative department or of actions of the executive department, both coordinate branches of government." *Wimberly v. Ettenberg*, 194 Colo. 163, 167, 570 P.2d 535, 538 (Colo.1977) (citation and internal quotation marks omitted). Thus, courts must take care not to "invade the fields of policy preserved to the legislative arm or the realm of [executive branch] administrative discretion." *Id.* at 167, 570 P.2d at 538 (citation and internal quotation marks omitted). The doctrine of standing seeks to prevent such judicial "invasion" of the legislative and executive spheres by requiring that only in-

jured parties—not the public in general—may seek redress in the courts.

As we set forth in *Wimberly*, our seminal standing case, suit must be brought not by "any and all members of the public," but rather by persons directly—and not remotely—interested in the challenged government action. *Id.* at 167, 570 P.2d at 538 (citation and internal quotation marks omitted). Thus, "any and all members of the public" must address their grievances against the government through the political process; those particularly injured by the government action may bring an "actual case" for judicial determination. *Id.* at 167, 570 P.2d at 538. As *Wimberly* makes clear, courts "cannot, under the pretense of an actual case, assume powers vested" in the other branches. *Id.* at 167, 570 P.2d at 538; *see also Conrad v. City and County of Denver,* 656 P.2d 662, 668 (Colo.1983) (before adjudicating a controversy, a court must be "assure[d] that an actual controversy exists so that the matter is a proper one for judicial resolution").

*Wimberly* adopted a two-part test to determine whether standing exists in a particular case. First, the plaintiff must demonstrate that the government action he challenges has caused him injury-in-fact. *See Wimberly,* 194 Colo. at 167, 570 P.2d at 538. Second, the plaintiff must show that the injury was to a legally protected right. *Id.* at 167, 570 P.2d at 539. The majority finds that petitioners meet this two-part test because they are Colorado taxpayers and therefore have "taxpayer standing." Maj. op. at 245. By finding standing in this case, the majority interprets taxpayer standing so broadly that it allows the judiciary to determine the propriety of government action at the behest of "any and all members of the public"—the specific danger against which *Wimberly* warns. 194 Colo. at 167, 570 P.2d at 538.

I would hold, contrary to the majority, that petitioners lack standing even under our already expansive taxpayer standing caselaw. As the court of appeals recognized in the opinion below, our taxpayer standing cases permit taxpayers to bring suit alleging that their tax dollars have been spent in an unconstitutional manner. *Barber v. Ritter,* 170 P.3d 763, 769 (Colo.App.2007) (describing caselaw as permitting taxpayers to challenge alleged unconstitutional expenditures of taxpayer funds). For example, in *Dodge v. Department of Social Services,* 198 Colo. 379, 381, 600 P.2d 70, 71 (Colo.1979), this court found that taxpayers had standing to bring a suit seeking "to enjoin the allegedly unconstitutional expenditure of public funds." In particular, the *Dodge* plaintiffs alleged that taxpayer funds were spent in violation of Article V, section 33 of the Colorado Constitution, which prevents disbursement of public funds "except upon appropriations made by law." In *Conrad,* this court relied upon *Dodge* to hold that taxpayers had standing to challenge the expenditure of taxpayer funds on a nativity scene allegedly in violation of the federal Establishment Clause. 656 P.2d at 668. Finally, in *Nicholl v. E-470 Public Highway Authority,* this court found that a taxpayer had standing to "seek[ ] review of what he claims is an unlawful government expenditure which is contrary to our state constitution," specifically Amendment 1. 896 P.2d 859, 866 (Colo.1995).

Although the court of appeals properly recognized that our taxpayer standing cases permit taxpayers to challenge the constitutionality of *the expenditure* of taxpayer funds, its mistake was to find irrelevant the fact that petitioners here are challenging *the transfer* of funds. *Barber,* 170 P.3d at 769. The fact that this case involves a challenged transfer, rather than a challenged expenditure, does make a difference. Our taxpayer standing cases rest on the premise that a taxpayer suffers an injury-in-fact when his or her tax dollars are spent in an unconstitutional manner. Here, petitioners cannot make such an allegation because they do not challenge the expenditure of tax dollars.

Rather than focusing on the expenditure of public funds, petitioners' claim focuses on the fact that monies in special cash funds were transferred into the general fund in violation of Amendment 1. More particularly, petitioners claim that the transfers constituted a "new tax" or a "tax rate increase" under Amendment 1 because the monies in the special cash funds were used to defray the general cost of government. Maj. op. at 244. According to petitioners, parties who paid

into the special cash funds effectively paid a "new tax" because—in addition to paying taxes they would otherwise pay into the general fund—they paid their special fee into the general fund as well. *See generally* maj. op. at 249–50.

The injury that petitioners complain of, therefore, is that the people who are obligated to pay into the special cash funds were harmed. Yet it is undisputed in this case that none of the petitioners paid anything into the special cash funds alleged to have been improperly depleted. Although petitioners started this case with plaintiffs who actually paid into the cash funds, those plaintiffs, for a variety of reasons,[1] no longer have claims before this court. The court of appeals stated that if petitioners "were determined to have no standing, we do not know who else could bring these constitutional challenges." *Barber*, 170 P.3d at 769. Contrary to the court of appeals' observation, plainly there are proper parties with standing to bring this case: those who paid into the special cash funds.[2]

Petitioners' inability to allege an unconstitutional expenditure of taxpayer funds is fatal to their claim of taxpayer standing. We made this clear in *Brotman v. East Lake Creek Ranch*, where we held that a landowner lacked taxpayer standing to challenge an agreement entered into by the State Board of Land Commissioners to allow a third party to purchase certain land. 31 P.3d 886, 887 (Colo.2001). Specifically, we accepted the Land Board's argument that "because [the landowner] has not alleged that the Land Board unlawfully spent any taxpayer funds in [the agreement], it was error for the court of appeals to conclude" that the landowner

had taxpayer standing. *Id.* at 891. Significantly, we noted that the Land Board's management of school lands is distinct from the funding of schools through general taxation. *Id.* at 892. Thus, "because the Land Board's management—or mismanagement—of school lands has no effect on the state's funding of schools through the taxing power, management decisions of the Land Board have no effect on [the landowner] as a taxpayer." *Id.* The fact that the landowner challenged an economic decision of the Land Board did not give him taxpayer standing because the economic decision did not involve the expenditure of tax dollars. *Id.*

Given the departure of the plaintiffs who actually paid into the special cash funds, petitioners are left simply with taxpayer standing. Yet as noted above, they cannot allege that they suffered a taxpayer injury because they challenge a transfer, not an expenditure, of funds. Moreover, as general taxpayers, petitioners *actually benefited* from the alleged improper transfers because, under petitioners' theory of the case, taxpayers to the general fund actually paid less in taxes because the general fund was being subsidized by the infusion of special cash funds. In other words, petitioners' own theory of the case defeats their standing claim. For these reasons, I would find that petitioners lack standing and remand the case with instructions that it be dismissed on this ground.[3]

## II.

Respondents do not ask us to overturn any of our taxpayer standing cases, and, as discussed above, it is not necessary to do so in

---

1. *See* Maj. op. at 244–45.

2. Petitioners cannot allege that injury to another satisfies standing requirements. For example, in *Nicholl v. E–470 Public Highway Authority*, an entity that had been party to the suit, the Arapahoe County Board of Commissioners, had dropped out of the suit, leaving only an individual taxpayer. 896 P.2d 859, 866 (Colo.1995). This court found that the individual taxpayer did not have standing to raise claims belonging to the Board. *Id.* Similarly in this case, petitioners do not have standing to raise claims properly

belonging to those who paid into the special cash funds.

3. Because petitioners fail to allege an unconstitutional expenditure of taxpayer funds, it is not necessary in this case to consider whether our taxpayer standing doctrine should be narrowed in light of federal precedent restricting such taxpayer standing to Establishment Clause claims. *See, e.g., Hein v. Freedom From Religion Found., Inc.*, —— U.S. ——, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (noting that the general rule against federal taxpayer standing is subject to narrow exception for Establishment Clause claims).

order to find that petitioners lack standing in this case. But we should take this opportunity to disavow some expansive dicta in those cases—dicta upon which petitioners rely—suggesting that taxpayers have standing not only to challenge expenditures of taxpayer funds, but to challenge *any* alleged unconstitutional action of the government.

In *Dodge,* as noted above, this court held that taxpayers had standing to challenge "the allegedly unconstitutional expenditure of public funds." *Dodge v. Dept. of Soc. Servs.,* 198 Colo. 379, 380, 600 P.2d 70, 70 (1979). The court went on, however, to discuss the notion that a citizen may have standing even "in the absence of direct economic injury." *Dodge,* 198 Colo. at 382, 600 P.2d at 71. In this regard, the court discussed two Colorado cases, *Howard v. City of Boulder,* 132 Colo. 401, 290 P.2d 237 (1955), and *Colorado State Civil Service Employees Ass'n v. Love,* 167 Colo. 436, 448 P.2d 624 (1968).

In *Howard,* this court found that a City of Boulder "taxpayer and citizen of the community" had standing to challenge an amendment to Boulder's city charter that changed the method of election from an at-large district to multi-district format. 132 Colo. at 404, 290 P.2d at 238. The court held that the plaintiff, as a "citizen and taxpayer," had an "interest in the form of government under which he is required to live...." *Id.* at 404, 290 P.2d at 238. The court went on to describe the interest as "not primarily confined to himself alone, but ... of great public concern." *Id.* at 404, 290 P.2d at 238 (internal quotation marks omitted).

In reliance on *Howard,* the court in *Love* found that a taxpayer had standing to challenge the constitutionality of the Administrative Reorganization Act of 1968, which reorganized the departments of state government. 167 Colo. at 444, 448 P.2d at 627. Again, the court noted that the individual plaintiffs had standing to challenge their "form of government under which [they are] required to live," and that the "rights involved extend beyond self-interest of individual litigants and are of great public concern." *Id.* at 444, 448 P.2d at 627 (internal quotation marks omitted).

When taken together, *Howard* and *Love* stand for the proposition that a citizen has standing to challenge the "form of government under which he is required to live." *Id.* at 444, 448 P.2d at 627. In this context, "form of government" refers to the *actual form* of government—that is, how the government is structured, whether it is an at-large versus a multi-district structure at issue in *Howard,* or the structuring of departments in state government at issue in *Love. See also Salazar v. Davidson,* 79 P.3d 1221, 1229 n. 4 (Colo.2003) (noting that, based on *Howard* and *Love,* the Attorney General would have had standing as an individual to challenge the constitutionality of the General Assembly's redistricting bill); *id.* at 1244 (Kourlis, J., dissenting) (joining part IV of the majority's opinion, including n. 4).

*Dodge* describes *Howard* and *Love* without making any particular statement about how the cases are relevant to taxpayer standing. By including this discussion, however, the court implied that taxpayer standing was a broader concept than merely permitting a taxpayer to challenge an unconstitutional expenditure. In her special concurrence, Justice Dubofsky, joined by Justice Erickson, suggested that the majority would allow standing as long as "a citizen-taxpayer averred a violation of a specific constitutional duty or prohibition." *Dodge,* 198 Colo. at 384, 600 P.2d at 73 (Dubofsky, J., specially concurring). We have, on occasion, described *Dodge* this way, although not always. *Compare Conrad,* 656 P.2d at 669 (describing *Dodge* as "apply[ing] state standing principles to allow taxpayers to invoke the assistance of the courts to prevent injury to a legal interest specifically protected by a state constitutional provision"), *and Nicholl,* 896 P.2d at 866 (citing *Dodge* for the proposition that "even where no direct economic harm is implicated, a citizen has standing to pursue his or her interest in ensuring that governmental units conform to the state constitution"), *with Brotman,* 31 P.3d at 889 (interpreting *Dodge* to require an allegation of unconstitutional expenditure of public funds to allow standing).

While dicta in some of our cases suggest that *Dodge* can be read to allow a taxpayer to

challenge any unconstitutional government act, the case should be read more narrowly. As noted above, *Dodge* (as well as *Nicholl* and *Conrad*) involved an allegation of an unconstitutional expenditure of public funds and concomitant injury to the taxpayer. *Dodge*, 198 Colo. at 380, 600 P.2d at 70. In contrast, neither *Howard* nor *Love* involved allegations of unconstitutional expenditures of taxpayer funds. Instead, they specifically challenged a change in the structure of government under which the citizen (who also happened to be a taxpayer) was living, *Howard*, 132 Colo. at 403, 290 P.2d at 238; *Love*, 167 Colo. at 442, 448 P.2d at 626, a challenge petitioners do not bring here.[4] *Dodge* mistakenly conflated two distinct lines of cases. It is incumbent upon us today to fix *Dodge's* mistake and to disavow our dicta suggesting that a taxpayer may challenge any government action based on her interest that the constitution be followed.[5]

### III.

If we permit petitioners to pursue their claim, as the majority does, we have reached the point of permitting "any and all members of the public" to challenge the propriety of any government action in court, contrary to *Wimberly's* express admonition. In my view, the majority makes a serious—and needless—incursion into the sphere of the other two branches by finding that petitioners have standing to raise the claims before us. I therefore respectfully concur only in its judgment.

I am authorized to state that Justice RICE and Justice COATS join in this concurrence.

---

**4.** Because petitioners do not base their claim of standing on a challenge to the structure of government, we need not consider the contours of that basis for standing. *See, e.g., Lance v. Coffman*, 549 U.S. 437, 127 S.Ct. 1194, 1198, 167 L.Ed.2d 29 (2007) (holding that plaintiffs had no standing to bring federal Elections Clause claim because they alleged a generalized grievance common to all members of the public).

**5.** While *Nicholl* based its standing holding on the fact that the plaintiff challenged an expenditure

as unconstitutional, the opinion also noted that because Amendment 1 provides that it is enforceable by individuals, individual taxpayers have standing to bring challenges under Amendment 1. 896 F.2d at 866.

However, the statutory provision permitting individuals to bring suit to enforce Amendment 1 merely authorizes a private cause of action, not standing for any particular individual to bring suit. Colo. Const. art. X, § 20(1).