Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 21, 2018

**2018 CO 36**

**No. 16SC377, <u>Colorado Union of Taxpayers Found. v City of Aspen</u>—Taxation— Constitutional Law—Local Government Law.**

In this case, the supreme court considers whether a $0.20 charge on paper bags is a tax subject to the Taxpayer's Bill of Rights ("TABOR"). The supreme court holds that if the primary purpose of a charge is to raise revenue for the general expenses of government, then the charge is a tax. Conversely, the supreme court concludes that a charge is not a tax if the primary purpose of a charge is to defray the reasonable direct and indirect costs of providing a service or regulating an activity, because such a charge does not raise revenue for the general expense of government.

After analyzing the charge in this case, the supreme court holds that this charge is not a tax. Aspen imposed this charge as part of a regulatory program aimed at waste-management, and the $0.20 charge for the right to use a paper bag bears a reasonable relationship to Aspen's cost of permitting that use. Because this charge is a not a tax it is exempt from TABOR's requirements. Accordingly, the supreme court affirms the court of appeals.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

### 2018 CO 36

---

### Supreme Court Case No. 16SC377
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1869

---

#### Petitioner:

Colorado Union of Taxpayers Foundation,

v.

#### Respondents:

City of Aspen; Steve Skadron, Adam Frisch, Art Daily, Ann Mullins, and Bert Myrin, all in their official capacities as members of the Aspen City Council.

---

### Judgment Affirmed
*en banc*
May 21, 2018

---

**Attorneys for Petitioner:**
Mountain States Legal Foundation
Steven J. Lechner
  *Lakewood, Colorado*

**Attorneys for Respondents:**
City of Aspen
James R. True, City Attorney
Andrea S. Bryan, Assistant City Attorney
  *Aspen, Colorado*

**Attorneys for Amicus Curiae Colorado Municipal League:**
Butler Snow LLP
Terrance Carroll
Martina Hinojosa
Dee P. Wisor
  *Denver, Colorado*

**Attorney for Amicus Curiae The TABOR Foundation**:
Rebecca R. Sopkin
  *Lakewood, Colorado*

**CHIEF JUSTICE RICE** delivered the Opinion of the Court.
**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins in the dissent.
**JUSTICE HOOD** dissents.

¶1 This case presents the question of whether Aspen's $0.20 paper bag charge is a tax subject to voter approval under the Taxpayer's Bill of Rights ("TABOR").[1] The trial court held that this charge is not subject to TABOR because it is not a tax, but a fee, as did the court of appeals.

¶2 Colorado voters enacted TABOR in 1992. In so doing, voters specifically limited the legislative taxing power of the state and local governments by requiring that any new tax must receive voter approval prior to implementation. However, when a government exercises its authority pursuant to its police power to regulate for health and safety, and imposes a charge as part of a regulatory regime, and the charge is reasonably related to the direct or indirect cost of regulating the activity, such a charge is not a tax subject to voter approval.

¶3 The primary purpose of a tax is to raise revenue for general governmental expenses. But, the primary purpose behind Aspen's charge is not to raise revenue; the primary purpose of the charge is to defray some of the costs of a comprehensive regulatory scheme aimed at improving environmental health and safety through a waste-reduction program. Because the bag charge is not a tax, TABOR's election

_____

[1] We granted certiorari to review the following issues:

1. Whether Aspen's levying of a $0.20 charge on every disposable paper bag provided by a grocer, which was imposed for the primary purpose of affecting customers' behavior and to fund services available to all Aspen residents, is a tax subject to TABOR.

2. What standard of review a court should apply when deciding whether the levying of a charge by a local government, without voter approval, violates TABOR.

3

requirements do not apply. Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶4 In 2011, the City of Aspen adopted ordinance 13.24, which took effect May 1, 2012. Aspen, Colo., Municipal Code § 13.24 (2017). This ordinance purported to impose a regulatory scheme designed to meet the city council's "duty to protect the natural environment and the health of its citizens and visitors." Under the ordinance, grocery stores within Aspen's city limits are prohibited from providing disposable plastic bags to customers. § 13.24.020(a).[2] Grocery stores may still provide paper bags to customers, but each bag is subject to a $0.20 "waste reduction fee," § 13.24.030(a), unless the customer is a participant in a "Colorado Food Assistance Program," § 13.24.070.

¶5 It is undisputed at the trial court that Aspen set the fee at $0.20 after considering a San Francisco study showing that the cost of subsidizing the recycling, collection, and disposal of plastic and paper bags in that market was $0.17 per bag. Aspen adjusted the cost to $0.20 based on its distance to recycling markets, the smaller size of its waste stream, and community input.

¶6 Through a system established by the ordinance, the grocers collect the $0.20 charge for each non-reusable bag a customer chooses to use, and Aspen then collects the charge from the grocers. Grocers are permitted to retain a portion of the charge to provide information about the charge to customers, to train staff, and to improve or

---

[2] Petitioner does not challenge this part of the ordinance.

4

alter infrastructure to allow for the implementation, collection, and administration of the charge. § 13.24.050(b). Grocers remit the remainder of the charge to Aspen on a form separate from their sales tax form. § 13.24.050(e). The grocers pay this remainder to the City of Aspen Finance Department, and the department deposits it into the "Waste Reduction and Recycling Account." § 13.24.050(d). The funds may not be used to supplant funds from the annual budget, and the funds never revert to the general fund. § 13.24.050(h)–(i). The payment covers the following, in order of priority:

(1) Campaigns conducted by the City of Aspen and begun within 365 days of the effective date of this act, to:
    (A) Provide reusable carryout bags to residents and visitors; and
    (B) Educate residents, businesses, and visitors about the impact of trash on the City's environmental health, the importance of reducing the number of disposable carryout bags entering the waste stream, and the impact of disposable carryout bags on the waterways and the environment.

(2) Ongoing campaigns conducted by the City of Aspen to:
    (A) Provide reusable bags to both residents and visitors; and
    (B) Create public educational campaigns to raise awareness about waste reduction and recycling;
    (C) Funding programs and infrastructure that allows the Aspen community to reduce waste and recycle.
    (D) Purchasing and installing equipment designed to minimize trash pollution, including, recycling containers, and waste receptacles;
    (E) Funding community cleanup events and other activities that reduce trash;
    (F) Maintaining a public website that educates residents on the progress of waste reduction efforts; and
    (G) Paying for the administration of this program.

§ 13.24.050(g)(1)–(2).

¶7    In its first year the bag charge was not sufficient to cover the overall program expenditures, and so Aspen has since allocated general funds to cover the remaining

5

expenses of the program. Aspen provided some of the services outlined in the ordinance prior to instituting this charge, and some of the services funded in part by the bag charge are provided to both city residents and visitors, regardless of whether the resident or visitor uses a paper bag and thus pays the charge.

¶8 Petitioner, the Colorado Union of Taxpayers Foundation ("CUT"), is a nonprofit whose goal is to "educate the public as to the dangers of excessive taxation, regulation, and government spending." After two of its members paid Aspen's bag charge, CUT sued the City of Aspen and several members of the Aspen city council in their official capacities. CUT asserts that Aspen's bag charge is a tax that was never subject to voter approval, and thus violates TABOR.

¶9 At the trial court, both Aspen and CUT moved for summary judgment. The trial court concluded that the charge is a fee, not a tax, and therefore not subject to TABOR; it thus granted Aspen's motion for summary judgment. The court of appeals, in a unanimous published opinion, affirmed. Colorado Union of Taxpayers Found. v. City of Aspen, 2015 COA 162, ¶ 27, 410 P.3d 625, 630. We granted certiorari, and we now affirm.

## II. Standing

¶10 While the trial court found that CUT has standing, and Aspen does not dispute this finding, standing is still a threshold issue that we review de novo. Barber v. Ritter, 196 P.3d 238, 245 (Colo. 2008). We have briefly mentioned associational standing in our prior cases, but we now explicitly hold that an organization has associational standing when: (1) its members would otherwise have standing to sue in their own right; (2) the

6

interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members of the lawsuit. See Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co., 195 P.3d 674, 687–88 (Colo. 2008), as modified on denial of reh'g (Nov. 24, 2008); see also Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 344 (1977).

¶11 So, in order for CUT to bring a claim, CUT must first show that its individual members have standing to sue. We have established that a plaintiff-taxpayer will have taxpayer standing when the plaintiff "demonstrate[s] a clear nexus between his status as a taxpayer and the challenged government action." Hickenlooper v. Freedom from Religion Found., Inc., 2014 CO 77, ¶ 12, 338 P.3d 1002, 1008. Here, two of CUT's members are Aspen residents who paid the required bag charge; these two members have taxpayer standing. Therefore, because two of CUT's members have taxpayer standing and could have brought suit themselves, CUT satisfies part one of the test.

¶12 Additionally, CUT satisfies parts two and three of the test. The organization was formed to educate the public as to the dangers of excessive taxation, regulation, and government spending, so the interests it seeks to protect—preventing governmental districts from circumventing TABOR—are germane to its purpose. Thus, the association has "a stake in the resolution of the dispute." United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–56 (1996). Finally, the relief CUT requests in this case is a court order that Aspen's bag charge is unconstitutional, which does not require the participation of its individual members.

7

See Warth v. Seldin, 422 U.S. 490, 515 (1975). Thus, CUT has associational standing in this case.

## III. Standard of Review

¶13 A trial court may enter summary judgment when there is "no genuine issue as to any material fact" such that a moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c). We review a trial court's decision regarding summary judgment de novo. Huber v. Colo. Mining Ass'n, 264 P.3d 884, 889 (Colo. 2011). When reviewing constitutional issues, we presume that statutes are constitutional. Barber, 196 P.3d at 248. Further, we have previously held that to be unconstitutional, these statutes must be shown to be unconstitutional beyond a reasonable doubt. Id. The same presumptions and burdens of proof apply when a court construes a municipal ordinance. Town of Dillon v. Yacht Club Condo. Home Owners Ass'n, 2014 CO 37, ¶ 22, 325 P.3d 1032, 1038.

¶14 In this case, we granted certiorari to determine whether we should modify the standard of review that a court should apply when deciding if an ordinance is unconstitutional. However, we conclude that this ordinance is constitutional under either the "beyond a reasonable doubt" or the "preponderance of evidence" standard. Because we hold that Aspen's bag charge is constitutional, we do not decide—and express no opinion about—whether we should change the standard a court should use when it holds an ordinance is unconstitutional.

## IV. Analysis

¶15 We begin with a brief background of TABOR and detail the differences between a government's legislative taxation power and its regulatory police power. We then analyze this charge and conclude it is not a tax.

### A. TABOR Background

¶16 TABOR is a constitutional amendment, adopted by popular referendum in 1992, that "places a check by the electorate on the exercise of legislative taxing power." Huber, 264 P.3d at 886. The intent of the voters in enacting TABOR was to "impos[e] limitations on the spending and taxing powers of state and local government." Bickel v. City of Boulder, 885 P.2d 215, 225 (Colo. 1994); see also Havens v. Bd. of Cty. Comm'rs, 924 P.2d 517, 519 (Colo. 1996) ("[TABOR] places limits on the ability of state and local government to tax and spend.").

¶17 TABOR applies to "districts," which are defined as "the state or any local government." Colo. Const. art. X, § 20(2)(b). Prior to implementing a new tax, districts must obtain voter approval for the new tax via an election. Id. art. X, § 20(4)(a). If a district is deemed to have illegally adopted a tax, a portion of the revenue collected pursuant to that policy must be refunded to taxpayers along with ten percent interest. Id. art. X, § 20(1). TABOR contains an internal rule of construction, which states that courts should interpret TABOR to "reasonably restrain most the growth of government." Id. But, "this principle . . . applies only where the text of [TABOR] supports multiple interpretations equally." Barber, 196 P.3d at 247–48. As a court, we

9

must be mindful of constructions of TABOR that would "hinder basic governmental functions or cripple the government's ability to provide services." Id. at 248.

¶18    For TABOR to apply, a district must have levied a tax. However, while TABOR defines seven terms, Colo. Const. art. X, § 20(2), notably absent is a definition of "tax." Therefore, we examine sources outside of TABOR to determine exactly when a district has levied a tax.

## B.  Legislative Taxation and Regulatory Police Power Background

¶19    The distinction between a municipality's power to tax and its regulatory police power "is thoroughly established, and with few exceptions, universally recognized." Post v. City of Grand Junction, 195 P.2d 958, 959–60 (Colo. 1948). The distinction is explicitly recognized in Colorado's statutory provisions governing municipalities. Compare § 31-15-302(1)(c), C.R.S. (2017) ("The governing bodies in municipalities shall have the following general powers in relation to the finances of the municipality: . . . To levy and collect taxes for general and special purposes on real and personal property."), and § 31-20-101, C.R.S. (2017) ("Power to levy taxes—on what property"), with § 31-15-401, C.R.S. (2017) ("General police powers"), and § 31-15-501, C.R.S. (2017) ("Powers to regulate business").

¶20    The Colorado Constitution permits the General Assembly to use taxes to "defray the estimated expenses of the state government." Colo. Const. art. X, § 2. Home rule cities have the power of taxation as well. Winslow Constr. Co. v. City & Cty. of Denver, 960 P.2d 685, 692 (Colo. 1998). We have previously defined taxes as charges that "raise

10

revenues for general municipal purposes." Bloom v. City of Fort Collins, 784 P.2d 304, 308 (Colo. 1989). Indeed, a hallmark of taxes is "that they are intended to raise revenue to defray the general expenses of the taxing entity." Zelinger v. City & Cty. of Denver, 724 P.2d 1356, 1358 (Colo. 1986). Thus, when looking to see if a district has levied a tax, we look to see if the district is attempting to raise revenue for the general expenses of government.

¶21 A municipality has a related but distinct power to regulate under its police power. Under this power, a municipality may set forth regulations to promote the health, safety, and welfare of its citizens both via its "inherent power" as a city, City of Colo. Springs v. Grueskin, 422 P.2d 384, 387 (Colo. 1966), and its statutory power, § 31-15-103, C.R.S. (2017) ("Municipalities shall have power to make and publish ordinances . . . which are necessary and proper to provide for the safety, [and] preserve the health . . . of such municipality and the inhabitants thereof . . . ."). A municipality's police powers are broad, Yacht Club Condo., ¶ 25, 325 P.3d at 1038, and can be used to "support education and outreach on environmental sustainability," § 31-15-711(1)(j), C.R.S. (2017).

¶22 At times, a government will use its regulatory and tax powers in tandem with one another. For example, the General Assembly imposed regulations on the sale and use of marijuana through its existing regulatory powers. § 12-43.3-102, C.R.S. (2017). In a separate provision, the General Assembly levied a tax on marijuana. § 39-28.8-202, C.R.S. (2017). So, while the government may permissibly regulate and tax the same

product, the government may levy a tax on a product only when using its legislative taxation power.

¶23     In the past, we have considered cases in which we have been asked to determine whether a charge was a tax or a regulatory charge. Our answer to that question in these cases turned implicitly on whether (1) the charge was imposed as part of a regulatory scheme enacted pursuant to the government's police powers and (2) the charge bore a reasonable relationship to the direct or indirect costs to the government of providing the service or regulating the activity. In cases in which the answer to these questions was yes, we determined that the charges were not taxes. Where the primary purpose of the charge was to raise revenue for the general expenses of government, we concluded that the challenged assessments were taxes.

¶24     In Bloom, for example, we confronted a challenge to a charge assessed on owners of developed lots fronting city streets. 784 P.2d at 305. The charge was part of a regulatory enactment, and its purpose was stated as follows:

> The Council hereby finds, determines and declares the necessity of providing maintenance and upkeep of the city's local streets and related facilities as a comprehensive Transportation Utility, with such maintenance to include, without limitation, the following activities: patching, crack sealing, seal coating, overlaying and other activities as are necessary in order that local streets and related facilities may be properly maintained and that the health, safety, and welfare of the city and its inhabitants may be safeguarded.

Id. To provide for that necessary maintenance, the city levied a charge on homeowners to defray some of the costs of its work. Id. at 305–07. The amount that each homeowner was charged was calculated by a formula designed to approximate the cost to the city of

12

maintaining that homeowner's frontage.  Id.  We held that this charge was not a tax because the charge on property was "reasonably related" to the specific government expenditure of maintaining city streets abutting those properties.  Id. at 305.  Likewise, in Loup-Miller Constr. Co. v. City & Cty. of Denver, we held that a charge assessed on new customers in apartment buildings was not a tax because the charge was imposed on "new customers to defray the cost of increased treatment capacity attributable to the addition of new customers to the system."  676 P.2d 1170, 1175 (Colo. 1984).  In Zelinger, we held that a charge assessed on property owners to pay for upgrades and modernization of Denver's storm drainage facilities was not a tax because the charge was assessed to defray the costs of the storm drainage improvements and the amount of the charge was set to capture the approximate direct and indirect costs of providing those improvements.  724 P.2d at 1358–59.  And in Western Heights Land Corp. v. City of Fort Collins, we held that a charge assessed on those using water and sewer facilities was not a tax because its "principal object" was to defray the cost of specific government services, not to raise revenue, and the amount of the charge bore a reasonable relationship to the cost of providing the services.  362 P.2d 155, 158 (Colo. 1961).  In each of these cases, the charge was part of a comprehensive regulatory regime, the charge was intended to defray, in part, the costs of that regulatory work, and there was a reasonable relationship between the overall cost of the service and the charge.

¶25    By contrast, in Cherry Hills Farms, Inc. v. City of Cherry Hills Village, the city imposed a "Service Expansion Fee," designed to raise revenue to cover the general governmental expenses associated with "rapid growth and development."

670 P.2d 779, 783–84 (Colo. 1983). We easily concluded—indeed the city conceded—that the charge was a tax, noting that "[t]here is no mention of any regulatory function in the ordinance." Id. at 782.

¶26 So, to determine whether a government has enacted a tax, or levied another type of charge, we must determine if the government is exercising its legislative taxation power or its regulatory police power. To make this determination, we examine the government's primary purpose for enacting the charge. Barber, 196 P.3d at 248–49. If the primary purpose is to raise revenue for general governmental use, it is a tax. Bloom, 784 P.2d at 308; Zelinger, 724 P.2d at 1358. Conversely, if a charge is imposed as part of a comprehensive regulatory scheme, and if the primary purpose of the charge is to defray the reasonable direct and indirect costs of providing a service or regulating an activity under that scheme, then the charge is not raising revenue for the general expenses of government, and therefore, not a tax. Zelinger, 724 P.2d at 1359; Western Heights Land Corp., 362 P.2d at 158. Because voters were concerned only with limiting a government's legislative power to tax, Bickel, 885 P.2d at 225–26, such regulatory charges are not subject to TABOR's election requirements.

¶27 One fairly straightforward way to determine whether a charge is imposed pursuant to a government's tax power or imposed incidentally to a regulatory scheme is to examine the government's stated purpose and the label that the government gives the charge. Of course, a "statutory charge may be labeled a fee, but in effect be a tax," Barber, 196 P.3d at 250 n.15, and we are normally called upon to decide only cases in which the government has attempted to circumvent TABOR's requirements by

14

pretending that a tax is, in fact, not a tax, and labeled it accordingly. Thus, when we are asked to determine if a charge is a tax, we focus our core inquiry on the practical realities of the charge's operation to determine if the charge's primary purpose is in fact to raise revenue for general governmental use. In taking this practical view, we consider whether there is a reasonable relationship between the direct or indirect cost to the government of providing the product or activity assessed and the amount being charged.

## C. Application

¶28 Aspen, as a home rule city, has the power of taxation set forth in the Colorado Constitution. Winslow, 960 P.2d at 692. As a district, it is constrained by TABOR's election requirements. Colo. Const. art. X, § 20(4)(a). Thus, while Aspen undoubtedly has the power to levy a tax, it may not use its taxing power in violation of TABOR. Aspen also has the power to enact regulations for the health and welfare of its citizens. Grueskin, 422 P.2d at 387. Because we were asked to determine if this charge is a tax, we examine the charge to determine if it is an exercise of Aspen's power to tax or of the city's regulatory power.

¶29 Initially, to determine whether Aspen exercised its legislative taxing power, we consider Aspen's stated purpose for the charge and the label of the charge. In the preamble to the ordinance, the city council stated that it has a "duty to protect the natural environment and the health of its citizens and visitors." The city council determined that single-use shopping bags contribute to "greenhouse gas emissions, litter, harm to wildlife, atmospheric acidification, water consumption and solid waste

15

generation." The city council further determined that "plastic bags have the greatest impact on litter and wildlife" and that "the best alternative to single-use plastic and paper bags is to shift to reusable bags for shopping." Based on these findings, the city council stated that it was in "the best interest of the health, safety and welfare of the citizens and visitors of Aspen to reduce the cost to the City of solid waste disposal, and to protect our environment and our natural resources by banning the use of disposable single-use plastic bags and to mandate a fee for the use of paper bags at grocery stores." Because the stated purpose of the ordinance is to protect the health, safety, and welfare of citizens and visitors of Aspen, and because Aspen labeled the charge a fee, we conclude that the ordinance does not facially purport to levy a tax.

¶30 While this is some evidence that Aspen did not enact a tax, we cannot stop our inquiry there. We must examine the practical realities of how the charge operates to determine if this charge is in fact imposed to defray the direct or indirect costs of regulation and if the amount of the fee is reasonable in light of those costs, or if the charge's primary purpose is to raise revenue for general governmental use. Here, the charge is assessed on consumers who choose to purchase non-reusable paper bags; those consumers must pay $0.20 to the grocery store for each non-reusable bag that they use. The grocery store remits a majority of the charge to the City of Aspen, which uses it to defray the cost of specific programs outlined in section 13.24.050(g). The scheme provides reusable carryout bags to residents and visitors, educates the public about the impact of disposable bags on the environment, raises awareness about waste reduction and recycling, and funds equipment designed to minimize trash pollution, including

16

recycling containers and infrastructure to support Aspen's recycling program. § 13.24.050(g). This regulatory scheme is more than just a recycling program, and the benefits of the waste reduction program are shared by citizens and visitors to Aspen who never pay the charge because they never use a paper bag. These facts do not make the charge a tax. We have held that a charge may incidentally benefit the general public without becoming a tax. Barber, 196 P.3d at 249–50. And the fact that the bag fee is part of a larger regulatory scheme that requires Aspen to spend money on more than just recycling bags would only present a problem if the amount charged for the bag bore no reasonable relationship to Aspen's cost of permitting the use of the bag. § 13.24.050(g).

¶31    It is to that question that we finally turn. We must determine whether the cost of the charge bears a reasonable relationship to the services that Aspen provides to charge payers. Barber, 196 P.3d at 250 n.15 (noting that a charge is a tax "if the statutory rate of the charge is unreasonably in excess of the cost of services the charge is designed to defray."). The charge at issue here is different from those we have considered in earlier cases in that Aspen is not providing the fee payer with a direct service such as storm drainage improvements, Zelinger, 724 P.2d at 1359, or road maintenance, Bloom, 784 P.2d at 305. Instead, Aspen is providing the indirect service of permitting the use of paper bags while recognizing that it will have to incur the cost of disposing of those bags. The government service for which the bag user is paying a fee is the waste disposal that will be necessitated by the use of that bag.

¶32    Aspen determined that the $0.20 charge was reasonable based on (1) a San Francisco waste-reduction study that found the cost of subsidizing recycling costs for

17

plastic and paper bags was $0.17 per bag, (2) the city council's own analysis of its recycling costs, and (3) input from the community. The $0.20 charge is the amount that Aspen believes, based on the above factors, that it costs to recycle a paper bag. Nothing in the record suggests that Aspen used biased or unscientific information in setting the charge at $0.20 per bag, and we perceive no infirmity in Aspen's methodology to determine the price of the charge. Moreover, it was undisputed at the trial court that Aspen set the charge at $0.20 because it believed this was the amount it cost the city to recycle a bag. A fee charged as part of a regulatory regime such as this one does not need to exactly match the cost of providing the service or regulating the activity, but only needs to bear a reasonable relationship to that cost. Given that standard, it is plainly reasonable for Aspen to charge $0.20 per non-reusable bag to defray the costs of its waste-management scheme.

¶33   Accordingly, this charge is not a tax. The primary purpose of the charge is not to raise revenue. The primary purpose of the charge is to defray the reasonable direct and indirect costs of administering Aspen's specific, regulatory, waste-reduction scheme, and, particularly, to recoup the costs of recycling the bags that shoppers are still permitted to use under this regulatory scheme. Because the charge is not a tax, TABOR does not apply.[3]

---

[3] Although we have determined that this is not a tax, CUT argues that because Aspen's bag charge was implemented for the purpose of influencing behavior, it is a sin tax. We disagree. While some taxes are conduct-regulating, it does not follow that every charge that regulates conduct is a tax. Municipalities frequently use penalties and fines—which are not taxes—to regulate conduct. For example, upon a criminal conviction, littering is punishable by a fine. § 18-4-511(3)(b)(4), C.R.S. (2017). Colorado

# V. Conclusion

¶34     Aspen's bag charge is not a tax of any kind.  Instead of raising revenue with this ordinance, Aspen sought to regulate the use of plastic and paper bags as part of its waste management efforts.  It did so by banning the use of plastic bags entirely and imposing a reasonable charge only on persons given a paper bag.

¶35     The amount of the charge imposed for the right to use a paper bag bears a reasonable relationship to Aspen's cost of permitting that use.  Because of the limited nature of the question that we were presented, we decline to comment about the differences between fees, penalties, fines, or any of the myriad of other types of governmental charges.  We were asked to determine if this charge is a tax.  It is not.  We therefore affirm the judgment of the court of appeals.


**JUSTICE COATS** dissents, and **JUSTICE BOATRIGHT** joins in the dissent.
**JUSTICE HOOD** dissents.

---

implemented this fine in an attempt to influence behavior—the State is discouraging its citizens from littering.  Under CUT's proposed analysis, this charge must be classified as a tax because the State levied the charge in an attempt to influence behavior.  But fines are different from taxes, and littering fines are a valid exercise of a municipality's police power.  People v. Hupp, 123 P. 651, 652–54 (Colo. 1912).  So, conduct regulation cannot be determinative of whether a charge is a tax, a fine, or a fee.  Certainly, a central goal of Aspen's waste reduction plan is to reduce the number of non-reusable bags in circulation.  But that goal does not convert Aspen's paper-bag fee into a tax.

JUSTICE COATS, dissenting.

¶36     In relieving Aspen of compliance with the popular approval requirements of the Taxpayer's Bill of Rights, I believe the majority so far departs from not only the language and clear intent of the constitutional amendment itself, but also the commonly accepted distinction between charging for something in particular and raising revenue for other governmental purposes, as to call for some response.  Notwithstanding its long-overdue critical analysis of the fundamental concepts involved, with much of which I agree, the majority's ultimate decision to uphold Aspen's exaction appears to disregard the very distinction it earlier articulates and effectively sever the essential link between the amount charged and the cost of the benefit provided.  Because I believe Aspen's "bag fee" simply cannot be upheld on the record before us, and because I believe that in purporting to do just that, the majority disserves legislative bodies struggling to meet the funding obligations of government without violating TABOR, I respectfully dissent and briefly outline my concerns.

¶37     Initially, I must note my belief that the majority tips the scale in favor of a particular outcome by characterizing the issue as a binary choice whether Aspen's paper bag charge is a tax or a fee, and since TABOR defines neither of these terms, imputing to TABOR what it considers to be the meanings given them by this court in substantially different contexts in the past.  By contrast, I believe the question for purposes of this TABOR analysis is more appropriately characterized as whether the exaction imposed by Aspen on paper grocery bags is a new revenue-raising measure, requiring the direct approval of the voters.  The relevant language of the constitution

1

actually requires voter approval in advance for "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain," and imposes specific limits on both governmental spending and revenue changes. Colo. Const. art. X, § 20(4)(a).

¶38 Even if we had previously attempted a global definition of "fees" as something distinct from "taxes," along the broad lines articulated by the majority today, I would therefore see no reason to think TABOR was intended to excuse from voter approval every governmental exaction meeting the majority's definition of a "fee." In fact, I believe both our prior use of the term "fees" and the dictates of TABOR are more reasonably understood as implicitly acknowledging the intuitive and virtually universally-accepted understanding that a charge for no more than the value or cost of some benefit—whether that be in the form of a privilege, a franchise, a license, a permit, or a good or service—provided by the government to a purchaser, or payer, does not amount to raising revenue at all, but is rather in the nature of a sale or direct exchange of things of comparable value, as in any proprietary transaction. While the majority at times expresses precisely this concept in distinguishing a "tax" from a "fee," at other points in its analysis, and particularly in applying this distinction to the bag exaction in this case, it subtly expands the "purpose" for which an exaction may be permissibly imposed and yet qualify as a fee. Although at times the majority quite rightly reasons that the characterization of an exaction as a fee is dependent upon a "reasonable relationship" between the amount of that exaction and the costs of the service for which

2

it is paid, the majority ultimately concludes that it is enough that the exaction bear a "reasonable relationship" to a "comprehensive regulatory regime," some aspect of which (apparently no matter how comparatively insignificant) serves to regulate the activity for which the charge is exacted.

¶39 Neither I nor the Union of Taxpayers opposing Aspen's so-called "bag fee" suggests that TABOR requires direct voter approval for every governmental exaction, regardless of its nature. There is no suggestion, for example, that a monetary penalty, or fine, imposed for violating a criminal proscription constitutes a tax. Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 567 (2012) ("In distinguishing penalties from taxes, this Court has explained that 'if the concept of penalty means anything, it means punishment for an unlawful act or omission.'"). While our own pre-TABOR case law differentiating among governmental exactions is largely confined to explaining why certain exactions are not properly characterized as ad valorum property taxes, see Bloom v. City of Fort Collins, 784 P.2d 304, 308–09 (Colo. 1989); Zelinger v. City & Cty. of Denver, 724 P.2d 1356, 1359 (Colo. 1986), and our only post-TABOR discussion touching on the distinction between taxes and fees is limited to the question whether exactions indisputably imposed as fees can lose that status by ultimately being applied to purposes altogether different from paying for the benefit for which they were imposed, see Barber v. Ritter, 196 P.3d 238, 248–49 (Colo. 2008), a rich body of case law accepting that not all non-penal governmental exactions amount to taxes is to be found in attempts by the federal judiciary to apply the Federal Tax Injunction Act. And as that body of case law largely demonstrates, while there is clearly much room for debate

3

about how indirectly governmental expenses may be related to the benefit provided and still be fairly treated as a "cost" of or payment in exchange for the value of that benefit, it is the offsetting or defraying of that cost, sometimes including even broad social costs associated with providing the benefit, or recouping that value, that distinguishes a fee from a tax. See Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist., 166 F.3d 835, 838 (6th Cir. 1999); San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992); Union Pac. R. R. Co. v. Pub. Util. Comm'n of Or., 899 F.2d 854, 860–61 (9th Cir. 1990).

¶40 I believe the majority's distinction between the exercise of the government's police powers in the interest of the health, safety, and welfare of the public, on the one hand, and the exercise of its power to tax, on the other, to be very significant, but not precisely for the reasons expressed by the majority. While regulating a privilege or benefit granted by the government may be necessary to prevent its exercise from threatening the health, safety, or welfare of the public or the destruction of public resources, and therefore the cost of that regulation may appropriately be treated as an indirect cost of granting the benefit in the first place, the mere fact that an exaction is imposed for regulatory purposes, or is earmarked to fund a "regulatory regime," cannot change its character as a tax or other revenue-raising exaction. The exercise of its police powers is a fundamental obligation of government, for which it is not only permitted but in fact required to raise revenue. Conceptually, a governmental exaction for regulatory purposes can amount to a non-revenue-raising fee, especially in the context of TABOR, only to the extent that the amount of the exaction is reasonably related to the

4

cost of the benefit, service, or "activity" for which it is imposed—not for the non-incidental regulation of other activities. I believe the majority's conclusion upholding Aspen's grocery bag exaction not only demonstrates that the majority has lost sight of the purpose of the inquiry—to determine whether an exaction is something other than a revenue-producing tax, which would require voter approval—but also that it simply fails to realistically account for the incidents of Aspen's bag "fee," as established by the record in this case.

¶41 Rather than simply comparing the cost of the benefit and the amount charged for it, the majority looks to the "primary purpose" of the ordinance. While it acknowledges, as it must with regard to tax statutes in particular, that the meaning of enabling legislation must be based on realities, or function, rather than labeling, or form, see Barber, 196 P.3d at 250 n.15 (expressly acknowledging that a statutory charge may be labeled a fee but in effect be a tax); Apollo Stereo Music Co. v. City of Aurora, 871 P.2d 1206, 1209–10 (Colo. 1994); People v. Becker, 413 P.2d 185, 186 (Colo. 1966) ("It is a familiar and well documented rule of law that taxation is concerned with realities and that, in considering tax matters, substance and not form should govern."); see also Nat'l Fed'n of Indep. Bus., 567 U.S. at 544 ("It is true that Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.") (emphasis in original), the majority nevertheless considers the "label" chosen by the legislature to be "a fairly straightforward way" to determine whether it is exercising its taxing power. Especially with regard to the Taxpayer's Bill of Rights, the express purpose of which was to limit the ability of

5

representative legislative bodies to raise revenue without submitting the question to the voters in the form of a plebiscite, the primary purpose of an exaction must be determined by its actual effect notwithstanding an indisputable intent of the legislature to avoid subjecting the exaction to voter approval altogether.

¶42 In fairness, after finding Aspen's stated purpose to be evidence that it did not enact a tax, the majority openly concedes that the "government service for which the bag user is paying a fee is the waste disposal that will be necessitated by the use of that bag," maj. op. ¶ 31, and it purports to examine the actual effect of the bag charge relative to that cost. However, after noting that "a charge may incidentally benefit the general public without becoming a tax," maj. op. ¶ 30, and that a "fee charged as part of a regulatory regime such as this one does not need to exactly match the cost of providing the service or regulating the activity," maj. op. ¶ 32, the majority simply announces, ex cathedra, that "it is plainly reasonable for Aspen to charge $0.20 per non-reusable bag to defray the costs of its waste-management scheme." Id. (emphasis added). To the extent the majority intends that the reasonableness of the charge be determined as compared to the costs of Aspen's waste-management program as a whole because it is a "comprehensive regulatory scheme," I consider that proposition unjustifiable for the reasons I have already explained; to the extent the majority intends that the broader regulatory purposes of the program funded by the charge are merely "incidental" to the recycling of the grocery bags in question, that proposition simply bears no relation to the record of findings in this case.

6

¶43 While categorization as a fee is clearly not dependent upon a precise one-to-one correspondence between the charge and the benefit provided, and while protecting the public from any deleterious effects of exercising the privilege or benefit is legitimately viewed as an indirect cost of providing the benefit itself, revenue may not be raised for other regulatory purposes beneficial to the public by setting the charge to a payer higher than necessary to offset the cost of the benefit provided him, and still be characterized as a "fee." Were it not obvious that a $0.20 charge can in no way reflect the cost of recycling a single paper grocery bag, the findings of the court in this case dispel any such suggestion. The district court expressly found that the "fees" in question are to be deposited into a "Waste Reduction and Recycling Account" administered by the City Environmental Health Department, to be used not only for various programs related to reducing and mitigating waste from disposable grocery bags but also for other programs related to waste management more generally, including: "the purchase and distribution of reusable shopping bags to residents and visitors; the implementation of education programs regarding the impacts of trash and disposable bags on the environment and the city's waste stream; the funding of waste reduction and recycling programs; purchasing and installing recycling containers and waste receptacles; maintaining a website to update residents on waste reduction efforts; and paying for the cost of administering the program." These services had been provided to city residents and visitors prior to the adoption of the ordinance and were paid for with general fund revenues, and they are currently made available to all city residents and visitors, whether or not they pay the bag charge. Rather than the city's

7

general waste reduction program being incidental, in any meaningful sense, to the disposal and recycling of paper grocery bags, it is the latter that is clearly incidental to the former.

¶44 Perhaps most importantly, however, the court also found from the undisputed evidence that the amount of the exaction was not set by simply analyzing the cost of collection, disposal, and recycling of the bags but rather was based on a "community consensus" concerning what would be required to modify the behavior of disposable bag users. As indicated by a city memorandum submitted as an exhibit, the purpose of the fee was "to create awareness around the topic of single use items." The memorandum further indicated that the amount of the fee had to be "high enough to incentivize change," and that the city staff felt that "a fee of $0.20 on paper bags" would be high enough to accomplish that, while a "smaller ten or fifteen cent fee would likely not be enough to affect the actions of customers."

¶45 Imposing a monetary exaction on the exercise of a privilege or the performance of a lawful act, in an amount designed to deter or dissuade the person charged from exercising that privilege or performing that act, is generally classified as a tax and, at least colloquially, designated a "sin tax." The term "sin tax" is used to refer to "[a]n excise tax imposed on goods or activities that are considered harmful or immoral . . . ." Black's Law Dictionary 1597 (9th ed. 2009); see also Naifeh v. State ex rel. Okla. Tax Comm'n, 400 P.3d 759, 770–75 (Okla. 2017) (concluding that an exaction imposed on cigarettes was a tax, not a regulatory fee, and, therefore, constituted a "revenue bill" that had been unconstitutionally enacted). While perhaps not designed

8

exclusively to raise revenues, exactions in the nature of sin taxes clearly contain an element of revenue raising and have therefore been characterized as "[t]axes that seek both to deter and to collect revenue when deterrence fails." Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 651 F.3d 722, 730 (7th Cir. 2011) (Posner, J., writing for the Seventh Circuit Court of Appeals sitting en banc, colorfully distinguishing taxes from fees for purposes of the federal Tax Injunction Act and explaining that "sin taxes" are considered a form of tax rather than a fee or penalty).

¶46     Unlike a penal exaction, on the one hand, a sin tax reflects a legislative choice not to proscribe a particular good or activity and impose a fine for the violation of its proscription; but instead to make lawful the undesirable good or activity, in exchange for the payment of a charge, calculatedly set in excess of the amount of general sales or use taxes on comparably priced goods. Unlike a fee, on the other hand, it reflects a choice to raise revenue, rather than merely offset expenses, by imposing an exaction greater and for purposes other than defraying the costs of providing or regulating the targeted good or activity itself. As a broadly recognized classification, see, e.g., Rachel Holmes Perkins, Salience and Sin: Designing Taxes in the New Sin Era, 2014 B.Y.U. L. Rev. 143, 155, 175 (2014) (noting that the "movement to 'go green' has included a movement to target sin taxes at eco-unfriendly activities[,]" including "on behaviors such as paper and plastic bag use" in some thirty jurisdictions), there is every reason to believe that the distinction between a "sin tax" and a "fee" was intended by the voters in enacting the Taxpayer's Bill of Rights.

9

¶47 In all meaningful respects, Aspen's "waste reduction fee" is in the nature of, and functions entirely as, a "sin tax." Like the other excise taxes for which they are responsible, grocers must collect, report, and remit the "waste reduction fee" to the city. Aspen City Code § 13.24.050 (2017). While imposing a charge on its customers for paper grocery bags may not be described in the ordinance as a sale, the grocer is nevertheless permitted to retain a portion of the "fee" it exacts, just as with a sale, id., and the exaction is effectively imposed upon an occurrence, or the "use" of a product, just as with excise taxes generally. Most importantly, however, as the district court expressly found, this "fee" is "intended to deter conduct rather than provide a specific quid pro quo service to those who pay the bag charge." Instead, it is clearly imposed, in the absence of complete deterrence, to raise revenue for a number of environmental purposes that are not merely incidental to the cost of regulating the use of paper bags.

¶48 In the greater scheme of things, sanctioning a $0.20 exaction by the City of Aspen on paper grocery bags without first getting direct voter approval does not seem to be a matter of great consequence. In light of the city's representations concerning community consensus in setting the amount of the exaction, it does not even appear that acquiring voter approval in this particular community would have been difficult. Were the outcome of this single case my only concern, it would therefore hardly have been worth the time and effort to write.

¶49 Of much greater concern to me is the potential effect of that outcome on the majority's legal analysis. While there is much in the majority's test for determining whether exactions are subject to voter approval with which I could agree, I fear that in

10

light of its sanctioning the exaction at issue here, the language in which the majority expresses its rationale cannot be taken at face value. As I believe the words actually used by the majority make clear, operating in a largely fee environment, even if doing so requires greater precision in particularizing charges to benefits, is nevertheless doable. Whether it might be preferable to allow representative legislative bodies greater flexibility in the use of tax policy to accomplish socially desirable ends is not a matter within the purview of the judiciary.

¶50 I respectfully dissent.

I am authorized to state that JUSTICE BOATRIGHT joins in this dissent.

JUSTICE HOOD, dissenting.

¶51　Our post-TABOR precedent should control the outcome of this case. And in Barber v. Ritter, 196 P.3d 238, 250 (Colo. 2008), we established the following test for distinguishing a tax from a regulatory fee: Is the primary purpose of the charge to defray the cost of services provided to the purchaser? If the answer is yes, then the charge is a fee, exempt from TABOR. If the answer is no, then the charge is typically a tax or tax policy change implicating TABOR. Because the answer to that key question here is plainly no, and because the majority's test will allow many de facto taxes to be relabeled TABOR-exempt "regulatory charges," I respectfully dissent.

## I. Standard of Review

¶52　I have no quarrel with the majority's standing analysis, and I agree with the majority's recitation of the governing standard of review. The parties debate whether the "beyond a reasonable doubt" standard of review should govern when determining if the levying of a charge by a local government, without voter approval, violates TABOR. Regardless of who's right, like the majority, I find the outcome to be the same. Thus, I presume the ordinance is constitutional, and, assume without deciding, that the more stringent "beyond a reasonable doubt standard" controls.

## II. Analysis

¶53　Because TABOR applies to taxes—and TABOR does not define "tax," Colo. Const. art. X, § 20(2), (4)—this case turns on how we determine whether a government demand for money is a tax. In establishing the controlling framework, I would focus on

1

our holding in <u>Barber</u>. And in applying <u>Barber</u>, I would consider how the ordinance itself demonstrates that its primary purpose is not to confer a benefit on those charged.

## A. The <u>Barber</u> Test Should Control

¶54 In <u>Barber v. Ritter</u>, this court held: "[A] charge is a 'fee,' and not a 'tax,' when the express language of the charge's enabling legislation explicitly contemplates that its <u>primary purpose</u> is to defray the cost of services provided <u>to those charged</u>." 196 P.3d at 250 (emphases added). The majority briefly acknowledges this language, but it does so only in diluting the test in favor of a "reasonable relationship" analysis. Maj. op. ¶¶ 26–31. More troubling still, the majority then applies its new test in a way that ignores the <u>primary</u> purpose of the monetary exaction at issue.

¶55 Rather than rely on the definition of "fee" provided in <u>Barber</u>, the majority focuses on its antecedents, <u>Zelinger v. City & County of Denver</u>, 724 P.2d 1356 (Colo. 1986), and <u>Bloom v. City of Fort Collins</u>, 784 P.2d 304 (Colo. 1989). <u>See, e.g.</u>, maj. op. ¶¶ 20, 24, 26. The majority's use of the <u>Zelinger</u> and <u>Bloom</u> line of cases is problematic for two reasons. First, the majority fails to adequately emphasize <u>Bloom</u>'s limitation that there must be a meaningful correlation between the class of people charged and the class of people benefitted. Second, <u>Zelinger</u> and <u>Bloom</u> predated TABOR and culminated in <u>Barber</u>, which should now control. A brief look at that evolution is helpful.

¶56 We did not provide an exact definition of "fee" in <u>Zelinger</u>, but in holding the charge there was a "fee," we reasoned: "The Ordinance in question does not raise revenue for general municipal purposes as a sole or principal objective. The use of

2

funds raised by the storm drainage service charge is restricted by . . . language in the Ordinance." 724 P.2d at 1359.

¶57 <u>Bloom</u> then expanded on <u>Zelinger</u> to define a "fee" as follows:

> Unlike a tax, a special fee is not designed to raise revenues to defray the general expenses of government, but rather is a charge imposed upon persons or property for the purpose of defraying the cost of a particular governmental service. The amount of a special fee must be reasonably related to the overall cost of the service. . . . A special fee, however, might be subject to invalidation as a tax when the principal purpose of the fee is to raise revenues for general municipal purposes rather than to defray the expenses of the particular service for which the fee is imposed.

784 P.2d at 308 (citations omitted).

¶58 The <u>Bloom</u> court explained that there must be a correlation between the class charged and the class benefitted, i.e., the service provided must be particularized to those charged. <u>Id.</u> at 309. After explaining that fees "defray the expenses of the particular service for which the fee is imposed," the court provided the following example of a charge that is not adequately particularized to the funded service: "At least one court has invalidated a special fee . . . on the basis that the service was not sufficiently particularized to justify the distribution of costs among the limited group of persons liable for the fee, rather than among the general public." <u>Id.</u> at 308–09 (citing <u>Emerson Coll. v. City of Boston</u>, 462 N.E.2d 1098 (Mass. 1984)). In applying the test, the court reiterated this required correlation and found it had been satisfied: "We . . . do not view the class of persons liable for the fee . . . so limited in relation to the nature of the service as to render the ordinance invalid." <u>Id.</u> at 310.

3

¶59    In Barber, the court built on Bloom, clarifying the degree of correlation required between those charged and those benefitted: "[A] charge is a 'fee,' and not a 'tax,' when the express language of the charge's enabling legislation explicitly contemplates that its primary purpose is to defray the cost of services provided to those charged." 196 P.3d at 250 (emphasis added). Thus, Barber added the phrases "primary purpose" and "to those charged" to the test. Id. In so doing, Barber focused Colorado's legal definition of "fee," and stare decisis dictates that the Barber primary purpose test should control now. See People v. Porter, 2015 CO 34, ¶ 23, 348 P.3d 922, 927 ("The doctrine of stare decisis requires that we follow pre-existing rules of law.").

¶60    Despite Barber's edict, the majority fails to show how the ordinance itself primarily seeks to benefit those charged. And it is there that I part company with the majority. Rather than looking for evidence in the enabling legislation that the government's primary purpose is to invoke its regulatory power, maj. op. ¶ 29, I would examine in tandem the terms "primary purpose" and "to those charged."

¶61    "To those charged" is straightforward enough: It means the people paying. Indeed, no one suggests otherwise.

¶62    The meaning of "primary purpose," on the other hand, is more elusive. From Barber we know that "primary" does not mean the sole purpose, because Barber expressly states "incidental defraying of general governmental expense does not transform a fee into a tax." 196 P.3d at 250. Yet, aside from stating what it is not, Barber does not define what "primary" means. Without the assistance of case law defining "primary" in this context, it's helpful to turn to a dictionary. See Kwiatkoski v. People,

4

706 P.2d 407, 409 & n.6 (Colo. 1985) (relying on the dictionary definition of "voluntary" when determining whether a jury would need additional instruction on the meaning of "voluntary" for the phrase "voluntary confession"). Webster's Dictionary defines "primary," in relevant part, as, "from which others are derived; fundamental; elemental; basic," and "first in importance; chief; principal; main." Primary, Webster's New College Dictionary (2005).

¶63 Thus, a charge is a fee, not a tax, when the express language of the charge's enabling legislation contemplates that its fundamental purpose is to defray the cost of services provided to the payer. The correlation of payment and benefit need not be exact, but it must be close enough to permit one to reasonably infer that it is first in importance.

¶64 With these thoughts in mind, I apply the Barber test.

## B. Application of the Barber Test

¶65 First, the easy part: Who are "those charged"? Here, "those charged" are the grocery store customers who pay $0.20 per paper bag at the store. Aspen, Colo., Ordinance No. 24, § 13.24.030(a) (2017).

¶66 Next, we ask: Is the primary purpose of Aspen's ordinance to defray the cost of a service to these customers? In order to answer this question, we must first determine what service is provided to the bag-purchasers, as distinguished from the general public. It might seem that the fee serves to defray the cost to the grocer of providing the paper bag, which constitutes the most, if not the only, direct, tangible benefit to the customer. However, recovering the cost of the paper bag itself is not among the

5

"allowable use[s]" identified in the ordinance. § 13.24.050(a), (b), (d) (permitting a grocer to retain 25% of each charge to provide consumer education, train staff, and improve or alter infrastructure to collect the charge, with the remaining 75% to be paid to Aspen for deposit in the Waste Reduction and Recycling Account). Thus, the purpose of the ordinance, primary or otherwise, is not to pay for the paper bags.

¶67 So what other service does the government provide to the bag-purchasers? The majority asserts the bag-purchasers receive the benefit of waste disposal. Maj. op. ¶ 31. But, from my perspective, the primary purpose—the fundamental, first-in-importance purpose—of the ordinance is not to provide waste disposal services to the bag-purchasers. Casual review of the ordinance makes this conclusion almost inescapable. It teems with references to groups other than the bag-purchasers on whom it seeks to confer broad benefits. It describes how the funds will be used for "residents, businesses, and visitors," and the "Aspen community." § 13.24.050(g). The ordinance states as follows:

> (g) Funds deposited in the Waste Reduction and Recycling Account shall be used for the following projects, in the following order of priorities:
>> (1) Campaigns conducted by the City of Aspen and begun within 365 days of the effective date of this act, to:
>>> (A) Provide reusable carryout bags to residents and visitors; and
>>> (B) Educate residents, businesses, and visitors about the impact of trash on the City's environmental health, the importance of reducing the number of disposable carryout bags entering the waste stream, and the impact of disposable carryout bags on the waterways and the environment.
>> (2) Ongoing campaigns conducted by the City of Aspen to:
>>> (A) Provide reusable bags to both residents and visitors; and
>>> (B) Create public educational campaigns to raise awareness about waste reduction and recycling;

(C) Funding programs and infrastructure that allows the <u>Aspen community</u> to reduce waste and recycle.
(D) Purchasing and installing equipment designed to minimize trash pollution, including, recycling containers, and waste receptacles;
(E) Funding community cleanup events and other activities that reduce trash;
(F) Maintaining a public website that educates <u>residents</u> on the progress of waste reduction efforts; and
(G) Paying for the administration of this program.

<u>Id.</u> (emphases added). Nowhere does the express language of the ordinance indicate this service is primarily intended for the bag-purchasers. <u>Id.</u> While a fee may benefit the general public incidentally, here, the benefit to the general public is not incidental — the express language of the ordinance indicates that a benefit to the general public is the primary purpose.

¶68 And even if we assume that the recycling and waste collection primarily benefit the bag-purchasers, on the theory that funding those services defrays the social cost of increased waste from the paper bags, those services fall in the bottom half of the ordinance's prioritized list. Step through the ordinance's nine purposes listed in order of priority and you won't encounter anything about waste collection or recycling services until number five. The top four priorities do not benefit bag-purchasers (including defraying their social costs) any more than they benefit the general public.

¶69 In short, the plain language of the ordinance reveals that it does not primarily serve to defray the cost of services for the bag-purchasers.

7

## III. Conclusion

¶70    Our sole post-TABOR precedent in <u>Barber</u> requires us to evaluate whether the "primary purpose" of the ordinance is to defray the cost of services "to those charged." Here, Aspen's bag ordinance, which overtly seeks to heap benefits on the entire Aspen community, is a tax. Tempting though it may be to provide a reprieve to local governments seemingly hamstrung at times by the strictures of TABOR, that policy decision is not ours to make. Because the bag charge is a tax, the voter approval requirement of TABOR applies. Colo. Const. art. X, § 20(4). Therefore, I respectfully dissent.