JUSTICE HOOD, dissenting.
¶ 51 Our post-TABOR precedent should control the outcome of this case. And in Barber v. Ritter, 196 P.3d 238, 250 (Colo. 2008), we established the following test for distinguishing a tax from a regulatory fee: Is the primary purpose of the charge to defray the cost of services provided to the purchaser? If the answer is yes, then the charge is a fee, exempt from TABOR. If the answer is no, then the charge is typically a tax or tax policy change implicating TABOR. Because the answer to that key question here is plainly no, and because the majority's test will allow many de facto taxes to be relabeled TABOR-exempt "regulatory charges," I respectfully dissent.
I. Standard of Review
¶ 52 I have no quarrel with the majority's standing analysis, and I agree with the majority's recitation of the governing standard of review. The parties debate whether the "beyond a reasonable doubt" standard of review should govern when determining if the levying of a charge by a local government, without voter approval, violates TABOR. Regardless of who's right, like the majority, I find the outcome to be the same. Thus, I presume the ordinance is constitutional, and, assume without deciding, that the more stringent "beyond a reasonable doubt standard" controls.
II. Analysis
¶ 53 Because TABOR applies to taxes-and TABOR does not define "tax," Colo. Const. art. X, § 20 (2), (4)-this case turns on how we determine whether a government demand for money is a tax. In establishing the controlling framework, I would focus on our holding in Barber. And in applying Barber, I would consider how the ordinance itself demonstrates that its primary purpose is not to confer a benefit on those charged.
A. The Barber Test Should Control
¶ 54 In Barber v. Ritter, this court held: "[A] charge is a 'fee,' and not a 'tax,' when the express language of the charge's enabling legislation explicitly contemplates that its primary purpose is to defray the cost of services provided to those charged." 196 P.3d at 250 (emphases added). The majority briefly acknowledges this language, but it does so only in diluting the test in favor of a "reasonable relationship" analysis. Maj. op. ¶¶ 26-31. More troubling still, the majority then applies its new test in a way that ignores the primary purpose of the monetary exaction at issue.
¶ 55 Rather than rely on the definition of "fee" provided in Barber, the majority focuses on its antecedents, Zelinger v. City & County of Denver, 724 P.2d 1356 (Colo. 1986), and Bloom v. City of Fort Collins, 784 P.2d 304 (Colo. 1989). See, e.g., maj. op.
*521 ¶¶ 20, 24, 26. The majority's use of the Zelinger and Bloom line of cases is problematic for two reasons. First, the majority fails to adequately emphasize Bloom's limitation that there must be a meaningful correlation between the class of people charged and the class of people benefitted. Second, Zelinger and Bloom predated TABOR and culminated in Barber, which should now control. A brief look at that evolution is helpful.
¶ 56 We did not provide an exact definition of "fee" in Zelinger, but in holding the charge there was a "fee," we reasoned: "The Ordinance in question does not raise revenue for general municipal purposes as a sole or principal objective. The use of funds raised by the storm drainage service charge is restricted by ... language in the Ordinance." 724 P.2d at 1359.
¶ 57 Bloom then expanded on Zelinger to define a "fee" as follows:
Unlike a tax, a special fee is not designed to raise revenues to defray the general expenses of government, but rather is a charge imposed upon persons or property for the purpose of defraying the cost of a particular governmental service. The amount of a special fee must be reasonably related to the overall cost of the service.... A special fee, however, might be subject to invalidation as a tax when the principal purpose of the fee is to raise revenues for general municipal purposes rather than to defray the expenses of the particular service for which the fee is imposed.
784 P.2d at 308 (citations omitted).
¶ 58 The Bloom court explained that there must be a correlation between the class charged and the class benefitted, i.e., the service provided must be particularized to those charged. Id. at 309. After explaining that fees "defray the expenses of the particular service for which the fee is imposed," the court provided the following example of a charge that is not adequately particularized to the funded service: "At least one court has invalidated a special fee ... on the basis that the service was not sufficiently particularized to justify the distribution of costs among the limited group of persons liable for the fee, rather than among the general public." Id. at 308-09 (citing Emerson Coll. v. City of Boston, 391 Mass. 415, 462 N.E.2d 1098 (1984) ). In applying the test, the court reiterated this required correlation and found it had been satisfied: "We ... do not view the class of persons liable for the fee ... so limited in relation to the nature of the service as to render the ordinance invalid." Id. at 310.
¶ 59 In Barber, the court built on Bloom, clarifying the degree of correlation required between those charged and those benefitted: "[A] charge is a 'fee,' and not a 'tax,' when the express language of the charge's enabling legislation explicitly contemplates that its primary purpose is to defray the cost of services provided to those charged." 196 P.3d at 250 (emphasis added). Thus, Barber added the phrases "primary purpose" and "to those charged" to the test. Id. In so doing, Barber focused Colorado's legal definition of "fee," and stare decisis dictates that the Barber primary purpose test should control now. See People v. Porter, 2015 CO 34, ¶ 23, 348 P.3d 922, 927 ("The doctrine of stare decisis requires that we follow pre-existing rules of law.").
¶ 60 Despite Barber's edict, the majority fails to show how the ordinance itself primarily seeks to benefit those charged. And it is there that I part company with the majority. Rather than looking for evidence in the enabling legislation that the government's primary purpose is to invoke its regulatory power, maj. op. ¶ 29, I would examine in tandem the terms "primary purpose" and "to those charged."
¶ 61 "To those charged" is straightforward enough: It means the people paying. Indeed, no one suggests otherwise.
¶ 62 The meaning of "primary purpose," on the other hand, is more elusive. From Barber we know that "primary" does not mean the sole purpose, because Barber expressly states "incidental defraying of general governmental expense does not transform a fee into a tax." 196 P.3d at 250. Yet, aside from stating what it is not, Barber does not define what "primary" means. Without the assistance of case law defining "primary" in this context, it's helpful to turn to a dictionary. See *522 Kwiatkoski v. People, 706 P.2d 407, 409 & n.6 (Colo. 1985) (relying on the dictionary definition of "voluntary" when determining whether a jury would need additional instruction on the meaning of "voluntary" for the phrase "voluntary confession"). Webster's Dictionary defines "primary," in relevant part, as, "from which others are derived; fundamental; elemental; basic," and "first in importance; chief; principal; main." Primary, Webster's New College Dictionary (2005).
¶ 63 Thus, a charge is a fee, not a tax, when the express language of the charge's enabling legislation contemplates that its fundamental purpose is to defray the cost of services provided to the payer. The correlation of payment and benefit need not be exact, but it must be close enough to permit one to reasonably infer that it is first in importance.
¶ 64 With these thoughts in mind, I apply the Barber test.
B. Application of the Barber Test
¶ 65 First, the easy part: Who are "those charged"? Here, "those charged" are the grocery store customers who pay $0.20 per paper bag at the store. Aspen, Colo., Ordinance No. 24, § 13.24.030(a) (2017).
¶ 66 Next, we ask: Is the primary purpose of Aspen's ordinance to defray the cost of a service to these customers? In order to answer this question, we must first determine what service is provided to the bag-purchasers, as distinguished from the general public. It might seem that the fee serves to defray the cost to the grocer of providing the paper bag, which constitutes the most, if not the only, direct, tangible benefit to the customer. However, recovering the cost of the paper bag itself is not among the "allowable use[s]" identified in the ordinance. § 13.24.050(a), (b), (d) (permitting a grocer to retain 25% of each charge to provide consumer education, train staff, and improve or alter infrastructure to collect the charge, with the remaining 75% to be paid to Aspen for deposit in the Waste Reduction and Recycling Account). Thus, the purpose of the ordinance, primary or otherwise, is not to pay for the paper bags.
¶ 67 So what other service does the government provide to the bag-purchasers? The majority asserts the bag-purchasers receive the benefit of waste disposal. Maj. op. ¶ 31. But, from my perspective, the primary purpose-the fundamental, first-in-importance purpose-of the ordinance is not to provide waste disposal services to the bag-purchasers. Casual review of the ordinance makes this conclusion almost inescapable. It teems with references to groups other than the bag-purchasers on whom it seeks to confer broad benefits. It describes how the funds will be used for "residents, businesses, and visitors," and the "Aspen community." § 13.24.050(g). The ordinance states as follows:
(g) Funds deposited in the Waste Reduction and Recycling Account shall be used for the following projects, in the following order of priorities:
(1) Campaigns conducted by the City of Aspen and begun within 365 days of the effective date of this act, to:
(A) Provide reusable carryout bags to residents and visitors; and
(B) Educate residents, businesses, and visitors about the impact of trash on the City's environmental health, the importance of reducing the number of disposable carryout bags entering the waste stream, and the impact of disposable carryout bags on the waterways and the environment.
(2) Ongoing campaigns conducted by the City of Aspen to:
(A) Provide reusable bags to both residents and visitors; and
(B) Create public educational campaigns to raise awareness about waste reduction and recycling;
(C) Funding programs and infrastructure that allows the Aspen community to reduce waste and recycle.
(D) Purchasing and installing equipment designed to minimize trash pollution, including, recycling containers, and waste receptacles;
(E) Funding community cleanup events and other activities that reduce trash;
*523 (F) Maintaining a public website that educates residents on the progress of waste reduction efforts; and
(G) Paying for the administration of this program.
Id. (emphases added). Nowhere does the express language of the ordinance indicate this service is primarily intended for the bag-purchasers. Id. While a fee may benefit the general public incidentally, here, the benefit to the general public is not incidental-the express language of the ordinance indicates that a benefit to the general public is the primary purpose.
¶ 68 And even if we assume that the recycling and waste collection primarily benefit the bag-purchasers, on the theory that funding those services defrays the social cost of increased waste from the paper bags, those services fall in the bottom half of the ordinance's prioritized list. Step through the ordinance's nine purposes listed in order of priority and you won't encounter anything about waste collection or recycling services until number five. The top four priorities do not benefit bag-purchasers (including defraying their social costs) any more than they benefit the general public.
¶ 69 In short, the plain language of the ordinance reveals that it does not primarily serve to defray the cost of services for the bag-purchasers.
III. Conclusion
¶ 70 Our sole post-TABOR precedent in Barber requires us to evaluate whether the "primary purpose" of the ordinance is to defray the cost of services "to those charged." Here, Aspen's bag ordinance, which overtly seeks to heap benefits on the entire Aspen community, is a tax. Tempting though it may be to provide a reprieve to local governments seemingly hamstrung at times by the strictures of TABOR, that policy decision is not ours to make. Because the bag charge is a tax, the voter approval requirement of TABOR applies. Colo. Const. art. X, § 20 (4). Therefore, I respectfully dissent.